# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

v.                         CASE NO. <u>09-40022-01-JAR</u>

LUIS BELTRAN-PALAFOX,

        Defendant.

## Government's Consolidated Response To Pretrial Motions Filed By Defendant Beltran-Palafox

APPEARS NOW the United States of America, by and through Lanny D. Welch, United States Attorney for the District of Kansas, and Jared S. Maag, Special Assistant United States Attorney, and for response to the pretrial motions filed by the defendant, submits the following:

1. The defendant has filed four pretrial motions in this matter. They are: a motion to compel discovery regarding informants (Doc. 36); a motion to join co-defendant Elenes-Mombela's motion for bill of particulars (Doc. 37); a motion to suppress evidence (Doc. 38);

and a motion to suppress statement (Doc. 39).[1]

2.    **The Facts**

On December 15, 2008, officers of the Saline County Police Department were conducting surveillance on a residence in New Cambria, Saline County, Kansas in relation to an on-going narcotics investigation.  During surveillance, officers noticed a 1991 Lincoln Towncar (KS TAG 130BHW) parked in the driveway and occupied by three individuals later identified as the defendant, the co-defendant, Elenes-Mombela, and an individual by the name of Garrett Greer.

During the surveillance on this date, the defendant and Elenes-Mombela were observed on more than one occasion entering and exiting the residence, returning to the Lincoln Towncar, and placing unknown items inside the vehicle.  Officers further reported that at one point during the surveillance, automatic gunfire was heard from the property, although none of the three individuals was observed with a firearm.

After approximately one hour, the defendant and Elenes-Mombela left the property in the Lincoln Towncar.  Officers followed the vehicle.

At approximately 1637 hours, Officer R. Garcia, who was on regular patrol in the Salina area, was informed by the officer trailing the Lincoln Towncar of its description and whereabouts, namely that the car's window tinting appeared to be darker than allowed by law and that the car was occupied by two subjects.  Officer Garcia was further informed that the car was registered to a Luis Beltran and that the subjects were possibly armed.

Shortly thereafter, Officer Garcia spotted the Lincoln Towncar, observed its window tinting to be "substantially dark" and as a result pulled the vehicle over.  Officer Garcia informed the driver (the defendant) of the reason for the stop and asked for the defendant's licence and current proof of insurance.  Officer Garcia noticed that the defendant and passenger (Elenes-Mombela) both appeared to be nervous.  The defendant advised Officer Garcia that he

---

[1]

Codfendant Elenes-Mombela joins co-defendant Beltran-Palafox's motion to compel (Doc. 36) and motion to suppress.  (Doc. 38).  The government has no objection to co-defendant Elenes-Mombela's request to join these two motions.

only had a Mexican driver's license and provided it to him.  The license identified the defendant as Oscar Daniel Villa Hurtado and appeared to have been issued by the Mexican state of Durango.

Officer Garcia conducted a license check and a check for warrants on the name Villa Hurtado and likely derivatives of that name.  During this check, Officer Garcia called for a canine unit to assist him at the stop location.  Dispatch was unable to locate a Kansas DL for Villa Hurtado.

Officer Garcia then made contact again with the defendant and at the same time conducted a test on the driver's side window using a tint meter.  The tint came back at 15%, well-below the allowable limit.[2]  Officer Garcia informed

---

[2] *See* Kan. Stat. Ann. 8-1749a(a)(3):

**One-way glass and sun screening devices; requirements; penalties.** (a) No motor vehicle required to be registered in this state and which is operated on the highways of this state shall be equipped with one-way glass or any sun screen device, as defined in K.S.A. 8-1749b, and used in conjunction with safety glazing materials that do not meet the following requirements:

(1) A sun screening device when used in conjunction with the windshield shall be nonreflective and shall not be red, yellow or amber in color. A sun screening device shall be used only along the top of the windshield and shall not extend downward beyond the AS1 line which is clearly defined and marked;

(2) a sun screening device when used in conjunction with the safety glazing materials of the side wings or side windows located at the immediate right and left of the driver, the side windows behind the driver and the rear most window shall be nonreflective; and

(3) the total light transmission shall not be less than 35% when a sun screening device is used in conjunction with safety glazing materials or other existing sun screening devices.

(b) The superintendent of the highway patrol may adopt such rules and regulations necessary to carry out the provisions of subsection (a).

(c) This section shall not prohibit labels, stickers or other informational signs that are required or permitted by state law.

(d) No motor vehicle required to be registered in this state which is operated on the highways of this state shall be equipped with head lamps which are covered with any sun screen device, adhesive film or other glaze or application which, when such lamps are not in operation, is highly reflective or otherwise nontransparent.

(e) (1) From and after July 1, 1987, and prior to January 1, 1988, a law enforcement officer shall

-3-

the defendant that dispatch was unable to find a valid driver's license under the name given. Officer Garcia then asked the co-defendant, Elenes-Mombela for identification. Elenes-Mombela gave Officer Garcia a Mexican ID which identified him as Raymundo Elenes-Mombela. The ID appeared to be from Mexico City.

Officer Garcia returned to his vehicle and spoke with Lt. Norton who advised that the defendant should be placed under arrest for failing to possess a valid DL. Lt. Norton further stressed that both subjects should be considered armed. At this point the Canine Officer, Deputy Jim Hughes arrived.

Officer Garcia made contact with the defendant and placed him under arrest, while Elenes-Mombela was asked to step out of the vehicle during the sniff by the canine.

At this point, Investigator Feldman arrived on the scene and questioned Elenes-Mombela about the defendant's identity. Elenes-Mombela stated that the defendant was "Oscar." Investigator Feldman asked Elenes-Mombela if the driver was Luis and he denied that it was Luis. Investigator Feldman made contact with the defendant and identified him as Luis Beltran-Palafox. He asked the defendant if that was his name and the defendant maintained that the vehicle belonged to Luis and that his name was Oscar. Elenes-Mombela, who was standing near the vehicle during the search, was thereafter arrested for obstruction.

The canine alerted to the presence of narcotics during the search of the vehicle. Due to the extreme cold, the vehicle was transported to the Salina Police Department garage to be searched.

During the search, the following was located: a baggie of methamphetamine, which would later conclusively show 55.20 grams of methamphetamine with a purity level of 99%, a baggie containing suspected MSM, and a loaded

---

issue a warning citation to any person violating the provisions of this section.

(2) From and after January 1, 1988, any person convicted of violating the provisions of this section shall be guilty of a misdemeanor.

**History:** L. 1977, ch. 27, § 1; L. 1984, ch. 39, § 20; L. 1987, ch. 48, § 3; July 1.

handgun hidden in the driver's side door under the window/lock control panel. On the passenger side of the vehicle, officers located a digital scale in the front passenger door under the window/lock control panel.

3.      **Argument**

**Motion To Compel Discovery**

4. For his first motion, the defendant (and co-defendant) move this Court for an Order compelling the government to disclose any and all confidential informants and information related to those informants.  Doc. 36 at 1-6.

5. In *Roviaro v. United States*, 353 U.S. 53 (1957), the United States Supreme Court articulated a balancing test for revealing confidential informants.  There the Court stated:

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege [of secrecy] must give way.
>
> . . . . .
>
> We believe that no fixed rule with respect to disclosure is justifiable.  The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense.  Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

Id. at 60-62.

6. In *United States v. Martinez*, 979 F.2d 1424 (10th Cir. 1992), the Tenth Circuit has further stated that:

> [C]ases involving confidential informants fall into several broad categories.

-5-

At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect the informant.

*Id*. at 1426 (quoting *United States v. Moralez*, 908 F.2d 565, 568 (10th Cir. 1990)).

7.  More recently, the Court in *United States v. Holmes*, 487 F.Supp.2d 1206, 1211 (D.Kan. 2007) made very clear the standard to be applied with respect to these types of motions.  The relevant portion of the opinion is as follows:

The Supreme Court in *Roviaro v. United States*, 353 U.S. 53 (1957), recognized the compelling public interest in favor of effective law enforcement and created a privilege that permits the government to withhold the identity of informants.  *United States v. Mendoza-Salgado*, 964 F.2d 993, 1000 (10th Cir. 1992).  Though anonymity encourages and protects informants, the Supreme Court held that the privilege yields to fairness if the informant's identity "is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Roviaro*, 353 U.S. at 60-61.  A decision on disclosure of identity entails "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense."  353 U.S. at 62.  Striking a proper balance depends on "the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.  *Id*.

The burden is on the defendant to come forward with evidence establishing that the *Roviaro* criteria favor disclosure.  *United States v. Blevins*, 960 F.2d 1252, 1258-59 (4th Cir. 1992).  "'Mere speculation about the usefulness of an informant's testimony is not sufficient to warrant disclosure.'" *United States v. Mathis*, 357 F.3d 1200, 1208 (10th Cir. 2004) (quoting *United States v. Brantley*, 986 F.2d 379, 383 (10th Cir. 1993)).  Generally, the Tenth Circuit requires disclosure when the informant's testimony "might be relevant to the defendant's case and justice would best be served by disclosure." *United States v. Reardon*, 787 F.2d 512, 517 (10th Cir. 1986).  In practice, the Tenth

Circuit has not required disclosure "where the information sought 'would be merely cumulative,' or where the informer did not participate in the illegal transaction," *Mendoza-Salgado*, 964 F.2d at 1001 (quoting *United States v. Scafe*, 822 F.2d 928, 933 (10th Cir. 1987)) (other citations omitted), where the informant is not a participant or witness to the crime, *United States v. Brantley*, 986 F.2d at 383, or where the informant is a mere tipster. *United States v. Wynne*, 993 F.2d 760, 766 (10th Cir. 1993).

*Holmes*, 487 F.Supp.2d at 1210-11.

8.  In this particular case, four confidential informants and a concerned citizen are referenced in a search warrant affidavit for the home of Garrett Greer, a suspected associate of the defendant, and a case synopsis by one of the lead investigators.[3]  They are identified as "CI #2," "CI #3," "CI 07-24," "CI KBI," and "CC1."

**CI #2**

9.  CI #2 requested anonymity because he / she had been threatened by those he / she had decided to inform on.  Thus, at the outset there is a compelling need to have this particular informant remain anonymous.  *Moralez*, 908 F.2d at 568.

10.  This CI advised that he / she had been dealing drugs for both defendants and that he / she had intimate knowledge of the inner workings of the defendants' extensive drug organization.  This CI was neither a participant, nor a witness / passenger on the day that the defendant's vehicle was stopped.  *Brantley*, 986 F.2d at 383.

---

[3]

The government assumes that these are the confidential informants that the defendant is alluding to.  The defendant has not specified with particularity which CI, or for that matter how many CI's, he is referring to.

**CI #3**

11.  CI #3 should be classified as the classic tipster.  *Wynne*, 993 F.2d at 766.  He / she was incarcerated and provided information about Greer and that Greer was being supplied with methamphetamine by a Mexican.  At some point, CI # 3 saw Greer with an individual who he / she subsequently identified as the defendant.  CI #3's information related largely to Greer and this informant's testimony would not be relevant to the defendant's case.  Thus disclosure is not warranted.  *Reardon*, 787 F.2d at 517.

12.  To be sure, this informant did not participate in the illegal transaction that formed the basis of the indictment, *Mendoza-Salgado*, 964 F.2d at 1001; nor was he / she a participant or witness to the vehicle stop.  *Brantley*, 986 F.2d at 383.

**CI 07-24**

13.  This particular informant also gave information about Greer, and *only* Greer. This informant does not mention either of the defendants in the information provided to law enforcement. As such, the defendants cannot establish that this CI "is relevant and helpful to [their defense], or is essential to a fair determination of [this] cause." *Roviaro*, 353 U.S. at 60-61.

**CI KBI**

14.  Like the previous CI's, CI KBI also gave information about Greer.  He /she stated in part that Greer's main supplier was a Hispanic male known as "Lordy."  CI KBI identified a photograph of the defendant as "Lordy."  This particular informant, not unlike the previous

informants, was neither a witness to the stop of the vehicle nor a participant / passenger in the vehicle.  He / she should also be considered at most a tipster and thus not subject to disclosure.  *Brantley*, 986 F.2d at 383.

**CC1**

15.  This particular individual appears to have been a worker simply performing a job in and around the defendant's home on or about September 10, 2008.  Like CI #3, this individual would be the classic tipster which would not require disclosure.  *Wynne*, 993 F.2d at 766.

16.  At the end of the day, none of the CI's "is relevant and helpful to the defense of [either] accused, or is essential to a fair determination of [the] cause." *Roviaro*, 353 U.S. at 60-61.  To be sure, the testimony of each of the informants would be damaging to the defense, and thus under the circumstances disclosure is unwarranted.  *Id*. at 62-64.  Indeed, it appears that the defendant seeks the identity of these informants because "[i]f [the defendant] is convicted, there is a very real possibility that the information provided by these unknown persons will be used in determining his sentence."  Doc. 36 at 2.  The defendant cites no precedent that holds the government responsible for turning over the identities of confidential informants based strictly on what the defendant's potential sentence might be.[4]

---

[4]

There appears to be scant support for the argument that the government must provide the names and identities of confidential informants prior to trial based solely on the belief that the defendant will be convicted and information provided by the CI's used by the government at sentencing. *See e.g., United States v. Washington*, No. 97-10329, 1998 WL 231105 at *2 (9th Cir. May 1, 1998) ("The duty of disclosure applies not only to trial, but also to sentencing proceedings in those cases in which the informant's testimony would be relevant and helpful."). *Roviaro*,

17.  The defendants have not met their burden of establishing that the *Roviaro* criteria favor disclosure.   *United States v. Blevins*, 960 F.2d 1252, 1258-59 (4th Cir. 1992). Accordingly, the government asks that their motion be denied.

### Joining Co-Defendant's Bill of Particulars

18.  The defendant seeks to join his co-defendant's bill of particulars wherein both seek to be informed of the particular quantity of drugs which they both are alleged to have possessed with intent to distribute. Doc. 35 at 1, Doc. 37.   The government has no objection to this request to join.

19.  It is well-established that "[t]he purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Higgins*, 2 F.3d 1094, 1096 (10th Cir. 1993)(quoting *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir 1988)).

20.  The defendants have been charged with possessing with the intent to distribute in excess of 50 grams of methamphetamine.   The government submits that the particular quantity of drugs that the defendants are alleged to have possessed is 55.20 grams (net weight) of methamphetamine with a purity level of 99%.   These facts are set forth in the discovery items provided to the defendants.[5]

---

however, speaks to the information proving to be relevant and helpful for a fair *trial*, not for sentencing purposes.  To that end, inquiry should remain focused on the trial level.

[5]

There are certainly instances demonstrated throughout the discovery that the defendants, at

21.  The government's response herein obviates the need for a bill of particulars.

## Motion To Suppress

22.  For his third motion, the defendant maintains that Officer Garcia had no reason to stop his vehicle as the tint on the window did not violate the statute.  Doc. 38 at 3.  The defendant further claims that the stop was nothing more than a pretext to look for narcotics. Doc. 38 at 3.  His arguments are without merit.

23.  It is well-settled that a law enforcement officer may make a brief investigatory stop of an individual so long as there is a reasonable basis for doing so.  *Terry v. Ohio*, 392 U.S. 1, 22-24 (1968).  An investigatory stop is far less intrusive than an arrest, and the level of suspicion necessary for such a stop is "considerably less than proof of wrongdoing by a preponderance of the evidence."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also*, *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (a routine traffic stop is more analogous to an investigative detention than a custodial arrest).  Whether Officer Garcia had the requisite reasonable suspicion to confront the defendant is based on the totality of the circumstances.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).[6]  Further, in determining

---

times other than the date alleged in the indictment, possessed methamphetamine with the intent to distribute.  This is certainly no surprise to the defendants, and would not require a bill of particulars to be filed, as those weights are simply relevant conduct.  *See United States v. Anderson*, 31 F.Supp.2d 933, 938 (D.Kan. 1998)("Unless the request for the bill of particulars shows, on its face, that failure to grant the request would result in prejudicial surprise, the preclusion of an opportunity for meaningful defense preparation, [or double jeopardy problems,] defendant has the burden of showing that his or her request meets one of the three criteria.").

[6]

The Supreme Court has made the following distinction between reasonable suspicion sufficient under *Terry* and probable cause: "Reasonable suspicion is a less demanding standard than

the reasonableness of the investigative detention, a dual inquiry by the Court is necessary, asking first whether the officers' actions were justified at their inception and second whether they were reasonably related in scope to the circumstances which justified the interference in the first place.  *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005) (citing *Terry*, 392 U.S. at 20)).

24.   This Court must review the alleged suspicious actions of the vehicle, not independent of one another, but within the context of the totality of the circumstances. *Arvizu*, 534 U.S. at 273-78.  In doing so, this Court must "accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions."  *United States v. Alvarez*, 68 F.3d 1242, 1244 (10th Cir. 1995).

25.   The record reflects that Officer Garcia witnessed a vehicle that appeared to have excessive window tinting.   This provided reasonable suspicion to stop the vehicle to determine whether a violation of the law was occurring.   Indeed, the Kansas state appellate courts have appreciated this very point finding that "neither the concepts of probable cause, nor 'articulable suspicion' would require that an officer have tint meter readings *before* making a stop for a window tint violation."  *State v. Kirk*, 196 P.3d 407, 409 (Kan.App. 2008) (emphasis supplied); *see also United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) ("While either probable cause or reasonable suspicion is sufficient to justify a

---

probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."  *Alabama v. White*, 496 U.S. 325, 330 (1990).

traffic stop, only the lesser requirement of reasonable suspicion is necessary.").

26.  Secondly, a pretextual motive is simply irrelevant if there was a valid basis to stop

the defendant's vehicle for a traffic or equipment violation.  *United States v. Pulido-Vasquez,*

No. 05-40154-01-JAR, 2006 WL 1764299 at *3 (D.Kan. June 26, 2006) ("The idea that the

stop was pretextual holds no legal significance because pretextual stops are legal when a

traffic violation has occurred."); *Whren v. United States*, 517 U.S. 806, 813 (1996) ("'[T]he

fact that the officer does not have the state of mind which is hypothecated by the reasons

which provide the legal justification for the officer's action does not invalidate the action

taken as long as the circumstances, viewed objectively, justify that action.'") (quoting *Scott

v. United States*, 436 U.S. 128, 138 (1978))); *Callarman*, 273 F.3d at 1286  ("When

determining whether an officer possessed a reasonable articulable suspicion, the subjective

motivations of an arresting officer are irrelevant."); *Devenpeck v. Alford*, 543 U.S. 146

(2004) ("As we have repeatedly explained, the fact that the officer does not have the state of

mind which is hypothecated by the reasons which provide the legal justification for the

officer's action does not invalidate the action taken as long as the circumstances, viewed

objectively, justify that action. The Fourth Amendment's concern with 'reasonableness'

allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.

Evenhanded law enforcement is best achieved by the application of objective standards of

conduct, rather than standards that depend upon the subjective state of mind of the officer.")

(internal citations, quotation marks, brackets omitted; emphasis supplied); *Brigham City v.*

*Stuart*, 547 U.S. 398, 404 (2006) ("An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action. The officer's subjective motivation is irrelevant.") (internal quotation marks, citations, and brackets omitted; emphasis supplied).

27.  The evidence will demonstrate that Officer Garcia had reasonable suspicion to conduct a traffic stop.  To that end, the defendant's Fourth Amendment rights have not been impinged.

28.  Equally without merit is the claim that the defendant "was unlawfully detained following the stop for the purpose of bringing a drug detection dog to the scene."  Doc. 38 at 4.

29.  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Cervine*, 347 F.3d 865, 870-71 (10th Cir. 2003).  As such, an officer ordinarily may not do more than ask to see a driver's license and registration and insurance documents, run a computer check on the car and driver, inquire about the driver's travel plans, and write out a citation. *Id.* at 871.  However, an officer may delay the driver for further investigation if the officer has an objectively reasonable, articulable suspicion of some illegal activity beyond the traffic violation. *United States v. Vazquez*, 555 F.3d 923, 929 (10th Cir. 2009).

30. Undoubtedly, the document provided to Officer Garcia by the defendant presented a problem.  Thus, it was certainly proper for Officer Garcia to follow up on the matter

involving the defendant's supposed identity and whether he had a valid DL. *Id*. at 930.

31. The facts do not suggest that the defendant was held beyond the scope of the stop. When Officer Garcia obtained a DL from the co-defendant, he returned to his vehicle to speak with Lt. Norton who was informed that the defendant did not have a valid DL. While this was happening, the canine officer arrived at the scene. The defendant was arrested and the co-defendant was asked to remove himself from the vehicle while the search was conducted. Investigator Feldman, who also arrived on scene, questioned the co-defendant about the identity of the defendant during the search of the vehicle. He was shortly thereafter arrested for obstruction.

32. There is simply nothing in the record to suggest that the stop was extended solely to bring a canine unit to the scene. As the video of the stop clearly shows, Officer Garcia was dealing with the defendant's supposed identity for a significant period of time. That issue simply did not resolve itself to the point where Officer Garcia's suspicions were alleviated. Thus, there was not an extended duration of the stop in order to wait for the canine unit. Indeed, the defendant cannot point to any nontrivial period of his detention from the initial stop to the dog alert when the officers were not conducting a proper follow-up. *Vazquez*, 555 F.3d at 929.

33. The defendant finally submits that the canine "did not provide probable cause to search [the defendant's] vehicle" as the canine was "not reliable." Doc. 38 at 5. It is well-settled that a defendant who seeks to suppress evidence bears the burden of proving that the

canine is unqualified. *United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009);

*United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994). The defendant has yet to establish

that the canine was unqualified; and as this is a fact question, he will need to prove this

allegation at the evidentiary hearing.[7]

## Statement Suppression

34.   For his final motion, the defendant submits that "he was questioned in a manner

designed to elicit incriminating statements;" namely that he was asked questions by the

officers prior to being given *Miranda* warnings. Doc. 39. at 1.

35.   Whether the defendant was questioned in the manner he posits will have to be

determined conclusively during the motions hearing. The government believes, however,

that testimony will show that the defendant was asked a series of "booking-type" questions

prior to being Mirandized.

36.   The Supreme Court's two principal cases addressing midstream *Miranda*

warnings are *Missouri v. Seibert*, 542 U.S. 600 (2004), the case relied exclusively on by the

defendant, and *Oregan v. Elstad*, 470 U.S. 298 (1985). In *Seibert* the Court addressed an

interrogation technique wherein the suspect was purposefully interrogated without warnings,

then apprised of her rights, and then asked a series of similar questions.   In a 5-4 decision[8]

---

[7]

The government incorporates by reference all other related Fourth Amendment responses as
set forth in the pleading related to the co-defendant Elenes-Mombela. *See* Doc. 42 at 18-21, ¶¶ 32-
36.

[8]

The dissenting justices found that both the defendant's statements were admissible under the

the majority held that both the pre-and post-*Miranda* statements should be suppressed.  Out

of the majority opinion, however, a plurality framed the threshold question as to whether in

such a situation it would be reasonable to find that the midstream warnings could function

effectively as *Miranda* requires.  542 U.S. at 612.  This effectiveness inquiry thus turned on

the question of whether the suspect had a real choice about giving an admissible statement

at that point in the interrogation.  *Id*. As the Court stated:

> "For unless the warnings could place a suspect who has just been interrogated
> in a position to make such an informed choice, there is no practical
> justification for accepting the formal warnings as compliance with *Miranda*,
> or for treating the second stage of the interrogation as distinct from the first,
> unwarned and inadmissible segment."

*Id*.

37.  From this, the plurality identified five factors that are to be analyzed to ensure that

a midstream warning is effective.[9]  The five factors to look to are:

> (1) The completeness and detail of the questions and answers in the first round
> of interrogation, (2) the overlapping content of the two statements, (3) the
> timing and setting of the first and second interrogations, (4) the continuity of
> police personnel, and (5) the degree to which the interrogator's questions
> treated the second round as continuous with the first.

*Id*. at 615; *see also Unites States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1135 (11th Cir. 2006).

38.  Applying the factors in the present situation supports a finding that the warning

---

voluntariness standard established in *Elstad*.

[9]

    Justice Kennedy, while disapproving of the midstream *Miranda* process, nevertheless
rejected the five factor analysis articulated by the plurality and limited his disapproval to those
situations where the technique employed by the officer(s) is used in such a calculating way as to
undermine the *Miranda* warning.  542 U.S. at 622.

was effective.  The initial questions appear to be nothing more than standard "booking type" questions commonly asked of a suspect, i.e. name, date of birth, employment, etc.  These types of questions are generally considered not to constitute interrogation for purposes of *Miranda*.  *Clayton v. Gibson*, 199 F.3d 1162, 1172-73 (10th Cir. 1999).  Secondly, the series of questions do not completely overlap, as the post-*Miranda* interview centered primarily on the defendant's activities on the day of his arrest.  There was no significant break between the booking questions and the defendant being Mirandized, and the two officers, Feldman and Garcia, were the only two law enforcement officers in the room.  Finally, apart from the defendant's identity, and the issues surrounding that, the questions in the post-*Miranda* interview were not continuous with the first.

39.  As a result, there is nothing to suggest that the *Miranda* warnings given after the booking questions were anything other than effective.

40.  More importantly, there is absolutely nothing which would demonstrate that the officers used deliberate, coercive or improper tactics in obtaining the initial statement. *Elstad*, 470 U.S. at 314 (rejecting the idea that a short earlier admission obtained in arguably innocent neglect of *Miranda* determined the character of a later warned confession).

41.  The initial questions were simply not designed to elicit an incriminating response on the part of the defendant.  This is evidenced in large part by the fact that Investigator Feldman, *after* the *Miranda* warnings were given, confronted the defendant with a photo of his Kansas driver's license showing the name Beltran-Palafox.  Indeed, if the officers'

-18-

designs were to get the defendant to confess pre-*Miranda*, not only about his identity, they could have immediately confronted him with the DL.   The fact that they waited until *Miranda* warnings had been issued supports the fact that the pre-*Miranda* questions were simple booking questions.

42.   Accordingly, the defendant's statement to officers following his arrest was not taken in violation of his Fifth Amendment rights.   The defendant's motion must therefore be denied.

## Conclusion

43.   WHEREFORE, the government respectfully submits that the search of the defendant's vehicle and subsequent statements to police did not violate those rights afforded under the Constitution.

44.   Finally, a bill of particulars is not necessary in this case.

Respectfully submitted,

LANNY D. WELCH
United States Attorney

By:    _/s/ Jared S. Maag_

JARED S. MAAG, KS Bar No. 17222
Special Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
jared.maag@usdoj.gov

-19-

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of July, 2009, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Marilyn M. Trubey
    Counsel for the Defendant
Office of the Federal Public Defender
424 S. Kansas, Room 205
Topeka, KS 66603
marilyn_trubey@fd.org


                 /s/ *Jared S. Maag*

                 JARED S. MAAG, KS Bar No. 17222
                 Special Assistant United States Attorney