**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09-40022-01/02-JAR** |
| | ) | |
| **LUIS BELTRAN-PALAFOX, and** | ) | |
| **RAYMUNDO ELENES-MOMBELA,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on defendant Raymundo Elenes-Mombela's Motion to Suppress (Doc. 33), and Motion to Join (Doc. 41), and defendant Luis Beltran-Palafox's Motion to Suppress (Doc. 38). On November 10, 2009, the Court was notified that the parties sought to submit their pretrial motions on the briefs without any additional hearing. After both parties delivered exhibits and expert reports, the Court reviewed the arguments and the evidence and determined that the record was factually and legally insufficient to rule on the issues raised by defendants in their pending motions. At a status conference January 6, 2010, the parties agreed to a half-day evidentiary hearing on March 29, 2010. At the close of the day March 29, the parties requested a second, full-day hearing on April 13, 2010. By the end of the day April 13, the parties requested leave to supplement their briefing before the Court took the pending motions under advisement.

The matter was fully briefed on April 29, 2010, and the Court took the motions under advisement at that time. Because no evidence was presented regarding the voluntariness of defendants' statements to law enforcement officers, the parties asked the Court to limit its ruling

to defendants' motions to suppress evidence obtained in the traffic stop. The Court will not rule on defendants' motions to suppress their statements until the time of trial.

Having reviewed the evidence and arguments presented by the parties regarding the suppression of evidence in this case, the Court is now prepared to rule. For the reasons explained in detail below, Beltran-Palafox's Motion to Suppress Evidence (Doc. 38), joined by co-defendant Raymundo Elenes-Mombela (Doc. 41), and Elenes-Mombela's Motion to Suppress Evidence (Doc. 33), are denied.

## I.      Factual Background

On December 15, 2008, officers of the Saline County Police Department were conducting surveillance on a residence in New Cambria, Saline County, Kansas in relation to an on-going narcotics investigation. During surveillance, officers noticed a 1991 Lincoln Town Car, bearing Kansas license plate number 130BHW, parked in the driveway and occupied by three individuals later identified as the defendant, Luis Beltran-Palafox, the co-defendant, Elenes-Mombela, and an individual by the name of Garrett Greer.

During the surveillance, Beltran-Palafox and Elenes-Mombela were seen entering and exiting the residence, returning to the Lincoln Town Car, and placing unknown items inside the vehicle. At one point during the surveillance, automatic gunfire was heard from the property, although none of the three individuals was observed with a firearm.

Approximately one hour later, Beltran-Palafox and Elenes-Mombela left the property in the Lincoln Town Car. Officers followed the vehicle.

At approximately 16:37 hours, Investigator McCary contacted Officer Ricardo Garcia, who was on regular patrol in the Salina area, to inform him that he was to stop the Lincoln Town

Car.  Investigator McCary gave a description of the vehicle and its location near Ohio Street, namely that the car's window tinting appeared to be darker than allowed by law and that the car was occupied by two subjects.  Officer Garcia was further informed that the car was registered to a Luis Beltran and that the subjects were possibly armed.  At the suppression hearing, Officer Garcia testified that someone on the drug task force informed him that the individuals were observed firing a handgun.

Shortly thereafter, Officer Garcia spotted the Lincoln Town Car, observed its window tinting to be "substantially dark."  Officer Garcia testified that he has stopped cars for window tinting violations on previous occasions.  He was unable to see the movement in the car because it was so dark.  Based on his experience, he suspected defendants' windows were below the 35% minimum set under Kansas law, and activated his emergency lights to stop the vehicle.  The traffic stop was videotaped, and part of the conversation was in Spanish.  Officer Garcia testified that he is fluent in Spanish.  Before approaching the car, he asked the sheriff's department to send a canine unit to assist him at the stop location.[1]

When Officer Garcia approached the driver (Beltran-Palafox), he informed him of the reason for the stop (dark window tinting) and asked for the driver's licence and current proof of insurance.  Officer Garcia noticed that the driver (Beltran-Palafox) and passenger (Elenes-Mombela) both appeared nervous; the passenger's hands were shaking and he began smoking.  Beltran-Palafox informed Officer Garcia that he only had a Mexican driver's license and provided it to him.  The license identified the driver as "Oscar Daniel Villa-Hurtado" and

---

[1]Officer Garcia testified at the suppression hearing that he made the request for a canine unit before he initially approached the vehicle, but his police report indicates that he made the canine request while he was having dispatch run a check on Beltran-Palafox's driver's license.

appeared to have been issued by the Mexican State of Durango.  Officer Garcia testified that he has seen such licenses on previous occasions.  He had no idea whether "Oscar Villa-Hurtado" was the driver's real name, but he suspected the Mexican license was not valid.

Officer Garcia returned to his patrol car to speak with other officers over the radio.  At one point in the conversation, Officer Garcia can be heard on the police video responding that there was "a DL issue anyway with the Mexican driver's license," explaining that he did not believe it was valid in Kansas.  However, he was uncertain whether a citation or a "15" was appropriate.  Officer Garcia also conducted a license check and a check for warrants on the name "Villa-Hurtado" and likely derivatives of that name.  Officer Garcia stated he did not know the identity of the passenger.  Dispatch was unable to locate a Kansas DL for "Villa-Hurtado" and found no warrants for "Villa-Hurtado."  Officer Garcia testified at the suppression hearing that the City of Salina informed its officers that a Mexican driver's license was not valid, and driving without a valid license is an arrestable offense.  He explained that there was no question in his mind the driver would be arrested.  However, on cross-examination, he noted that it is not an offense for someone traveling through the state to use a Mexican driver's license, and he had never before seen this particular car or these defendants.

Officer Garcia again made contact with the driver and at the same time checked the tint on the driver's side window using a tint meter.  Although Officer Garcia could not remember the last time the tint meter had been tested, on this occasion, the tint came back at 15%, well below the allowable limit of 35%.[2]  Officer Garcia informed Beltran-Palafox that dispatch was unable to find a valid driver's license under the name given.  Officer Garcia then asked the passenger,

---

[2]*See* K.S.A. § 8-1749a(a)(3).

Elenes-Mombela, for identification. Elenes-Mombela gave Officer Garcia a Mexican identification card, which identified him as Raymundo Elenes-Mombela. The ID appeared to be from Mexico City.

Officer Garcia returned to his vehicle and spoke, via radio, with Lt. Norton who advised that Beltran-Palafox should be placed under arrest for failing to possess a valid driver's license. Lt. Norton further stressed that both subjects should be considered armed. Officer Garcia stated over the radio that he would wait to perform the arrest until a second officer arrived.

While waiting, Officer Garcia asked dispatch to do a check on Elenes-Mombela's identification. Dispatch eventually responded to report Elenes-Mombela had a "system generated license," which Officer Garcia indicated was "not valid." On the video, dispatch made final contact with Officer Garcia at 16:53:40 to tell Officer Garcia that he found Elenes-Mombela "locally" as well.[3] At the hearing, Officer Garcia testified that Elenes-Mombela had a suspended license and would not be able to drive the vehicle.

After this, Officer Garcia no longer communicated with dispatch, but waited in the patrol car for the other officer to arrive. At 16:54:00, Officer Garcia called another officer and asked, "How far out are you?" At 16:56:13, the video records the sound of a dog. When Canine Officer Deputy James Hughes arrived on the scene with Rony, the drug detection dog, Officer Garcia exited the patrol car. Officer Garcia explained that he intended to "15" the driver and do a search-incident-to-arrest.

Officer Garcia made contact with Beltran-Palafox, asked him to step out of the vehicle, performed a patdown search, and placed him under arrest. Officer Garcia closed the front

---

[3]Although neither party explained whether "locally" means he had a "local" license, Officer Garcia testified that Elenes-Mombela did not have a valid license to operate the vehicle.

driver's side door.  After Beltran-Palafox was placed in the patrol car, Officer Garcia explained to the other officer that he intended to do a patdown of the passenger for weapons, but stated that he "might be released."  Some discussion was had about "holding" him.  At this point, Officer Garcia contacted Elenes-Mombela and asked him to step out of the vehicle during the sniff by the canine.  Officers performed a patdown search of Elenes-Mombela.  The officers discussed the possibility of someone coming to pick up the car.  On the video recording, the officers also discussed Elenes-Mombela's request to have his girlfriend pick up the car.  At some point, Elenes-Mombela's phone was taken from him and his wallet was turned over to officers on the drug task force.

On the video, Deputy Hughes is seen with the canine, Rony, circling the vehicle multiple times (approximately three times).  The front passenger door remained open after Elenes-Mombela exited the vehicle.  Hughes and Rony passed the front passenger door, but Hughes pulled the dog away and the team circled the vehicle one full time.  Upon returning to the front passenger door a second time, Hughes allowed Rony to enter the front passenger door.  He let go of the leash and opened the back passenger door on the right side.  He closed the front passenger door and Rony exited the back passenger door.  They then moved to the opposite side of the car, and Hughes opened the back seat passenger door (behind the driver's seat) and allowed Rony to enter the vehicle.  A package fell out the door and when Rony exited, the team moved away from the vehicle.  Another person on the scene threw the package into the car and closed the door. Hughes and Rony returned to the vehicle.  Hughes opened the driver's side door and allowed the dog to enter again.  When the dog exited, he closed the door.  This concluded the drug-dog sniff. Although the events inside the car cannot be seen on the police video, Hughes testified that Rony scratched at the floor in the back passenger seat and the floor by the front driver's seat when he

was inside the vehicle, alerting to the presence of narcotics.

While the drug dog sniff was ongoing, Investigator Feldman arrived on the scene and asked Elenes-Mombela who owned the car. Officer Garcia testified the conversation between Feldman and Elenes-Mombela was in English and Garcia did not translate Feldman's questions. Garcia was the only officer on the scene who spoke Spanish. Elenes-Mombela stated, "Uh, my friend." Investigator Feldman then questioned Elenes-Mombela about the driver's identity.[4] Elenes-Mombela stated that the driver was "Oscar." Investigator Feldman asked Elenes-Mombela if the driver was "Luis," and Elenes-Mombela denied that the driver was "Luis." On the video, an unidentified officer can be heard repeating, "Don't lie to me," and asking for the name of the driver.[5] Officer Feldman arrested Elenes-Mombela for obstruction of the investigation because he stated the driver was "Oscar," and he was transported to the Salina Police Department. Officer Garcia testified that Feldman knew of someone with the nickname "Lordy," but Officer Garcia had no knowledge of defendants' nicknames or their relationship.

Due to the nearly freezing temperatures outside, the vehicle was transported to the Salina Police Department garage to be impounded and searched. Officer Garcia testified that there was no one to pick the vehicle up. He explained that he was involved in interpreting for the police and both defendants. The entire stop, including the dog sniff of the vehicle, lasted approximately 28 minutes.

Officer Greg Swanson did the inventory search of the vehicle. During December 2008, he worked as an I-135/I-70 Drug Task Force Officer in the Saline County Sheriff's Department.

---

[4]This exchange can be heard on the police video, as they seem to be standing next to the patrol car.

[5]In the government's brief, the government stated that Feldman made contact with the driver and identified him as Luis Beltran-Palafox. This was not presented at the evidentiary hearing.

He regularly inventoried vehicles that had been impounded. When defendants' vehicle was brought to the police station, Investigator Feldman informed Swanson that a drug dog had alerted to the vehicle, but Swanson was not told where. Swanson testified that less than one minute after opening the driver's door, he noticed the control panel was loose and had non-factory screws and fresh tool marks. He worked in narcotics and had training and experience with concealed compartments in vehicles, and he routinely checked the door panels because it has a natural void where drugs may be hidden. He stated he would do so even if no drug dog alerted to the vehicle. Swanson testified at the hearing that the control panel in this case was loose, and it could simply be moved with the fingers; only the wires within the control panel were attached. The Saline County Sheriff's Department had a policy that, whenever a vehicle was impounded, towed, or seized, the vehicle was inventoried and all items inside the vehicle are to be noted on an inventory sheet. In searching the defendants' vehicle, Swanson found: a baggie of methamphetamine, which would later conclusively show 55.20 grams of methamphetamine with a purity level of 99%, a baggie containing suspected MSM, and a loaded handgun hidden in the driver's side door under the window/lock control panel.

On March 16, 2009, defendants Beltran-Palafox and Elenes-Mombela were indicted (Doc. 1). On April 15, 2009, a First Superseding Indictment was issued (Doc. 15), charging both defendants with possession, with intent to distribute, 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Luis Beltran-Palafox was indicted on a second count for carrying a firearm, to wit: a Ruger SR9, 9 mm, semi-automatic handgun, bearing Serial No. 330-04654, in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

### Canine Rony

At the suppression hearing, Deputy James Hughes, the canine handler, and two experts,

Steven Nicely and Kenneth Wallentine, testified on the issue of Rony's training and reliability in this case.

Hughes has worked as a canine officer since 1999, trained and worked with three different drug detection dogs, and attended numerous training schools and in-services dealing with drug enforcement, including 120 hours of training as a canine officer in Texas. Hughes got Rony in 2003. Rony was certified by the Nelson Rivera canine school in Junction City, Kansas before Hughes received him. Rony was certified for a dual purpose: for narcotics detection and for general patrol purposes, including apprehension, evidence recovery, tracking, and area searches. He was an aggressive indicator, meaning he demonstrated the presence of narcotics generally by scratching, biting and barking. When Rony was successfully certified in 2003, through "blind" testing, meaning Hughes did not know where the items were located. As maintenance, the team trained sixteen hours monthly with a group of other handlers from area police departments, utilizing various environments and types of narcotics. Rony and Hughes' annual certification came through the Heart of America Police Dog Association ("HAPDA"), where he learned to keep records for Rony during testing and field work documenting when Rony was deployed, the circumstances and location of the search, how the canine behaved, and whether anything was found. Hughes learned to improve his record-keeping practices from other handlers and training classes. From 2003 until 2009, the certification standards were consistent and often involved four tests performed over a series of days. Rony never failed any certification test.

Hughes testified that Rony had some problems with attention when he first started. He would get distracted by hot dogs. However, Hughes testified that training was done to proof Rony off hotdogs, so that he was not searching for the hotdogs, but for the narcotics. Rony was

"proofed off" various items, including money, plastic baggies, dog food, and his "calm ball." As Rony improved, he learned to leave the proofing items alone.

Hughes noted that Rony has previously become "overwhelmed" by large amounts of narcotics, but such behavior is common among drug detection dogs. They are trained to identify the source of the odor, but when the odor is overwhelming, the dog becomes confused. Hughes stated that he is familiar with Rony's personality and can detect when he is less motivated or less engaged.

From Rony's training reports, Hughes was able to generate percentages to determine Rony's reliability. Hughes divided the number of "known finds" presented in training by the number of times Rony found narcotics correctly and determined Rony's success rate as follows:

2004 – 91.3%
2005 – 87.4%
2006 – 96%
2007 – 94%
2008 – 90%

As a canine handler, Hughes testified that he would not be satisfied with anything below 85%. In each of these scenarios, Hughes was unaware of the location of the narcotics; it was placed by a third party. Hughes explained that he did not use field performance to calculate Rony's percentages because a drug dog is trained to detect odor, and even when the officers are unable to find actual narcotics, it does not mean the odor is absent. Because it is not a controlled environment, there is no way for officers to determine whether narcotics were once present in the location where the dog gave a "false alert." Thus, Hughes considered field performance an unreliable measure of a drug dog's accuracy.

Hughes testified that he frequently allows Rony off the leash to search, but will keep Rony on the leash when a search is performed on the interstate. On December 15, 2008, the

weather was below freezing. The heater in defendants' vehicle was running and the air currents were moving the odor from the car. Rony is trained to find the "saturation point" or the "source" of the odor. Although Hughes was asked whether he "jerked" Rony's leash during the search of the vehicle, Hughes explained that he did not, but often moves the leash behind him and changes hands as he and Rony change directions around a vehicle.

Hughes explained that, when they first passed the front passenger door, Rony "trie[d] to lunge into the door" and Hughes restrained him from entering because he wanted to make a second pass to determine if "this [was] the real deal." Hughes redirected him to circle the vehicle. Hughes testified that Rony did not alert outside of the vehicle but gave an alert for the first time when he was inside the vehicle. Rony's breathing became more intense and when he entered the car, and he began biting and scratching at the driver's seat. Hughes told him he was a "good boy" and redirected him to search the rest of the car to determine if the saturation point was stronger elsewhere. At one point, Hughes let him off the leash and Rony jumped into the back seat of the car, where he began scratching at the floor of the passenger's seat, behind the driver's seat, identifying that as the saturation place.[6] When Rony entered the front driver's door, Rony passed by the console where the narcotics were located and did not immediately alert. Hughes was not concerned by this because Rony's nose was never on the console, but Rony alerted within six inches of the source. Hughes explained that he never gave Rony a "cue."

On cross-examination, defense counsel noted that there were instances in Rony's training

_____

[6]Defense counsel correctly notes that Hughes' testimony at the hearing was somewhat inconsistent with the sequence of events as they occurred on the police video. Nevertheless, the number of times the dog entered the vehicle and the door through which he entered can easily be established from the video. Hughes' testimony is more probative on matters that occurred when Rony was inside the vehicle.

records and reports where he became distracted during a search, failed to detect narcotics, and responded to non-contraband items. Hughes admitted that such instances did occur.

Rony died March 30 or 31, 2009, of Lou Gehrig's disease, but he did not exhibit symptoms until early March of 2009.

## II.    Expert Testimony

At the evidentiary hearing on defendants' motions to suppress, the government objected to the expert testimony of Steven Nicely. The Court took the matter under advisement. Because several issues in defendants' suppression motions rely on the expert testimony by Steven Nicely, the Court will first address the government's objections.

### A.    *Daubert* Standard

The Court has broad discretion in deciding whether to admit expert testimony.[7] Fed. R. Evid. 702 provides that a witness who is qualified by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."[8]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[9] In order to determine whether an expert opinion is admissible, the

---

[7]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (citation omitted).

[8]Fed. R. Evid. 702.

[9]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[10] This requires a preliminary inquiry into the expert's qualifications and "whether the reasoning or methodology underlying the testimony" is reliable under the standards set by Rule 702.[11] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[12] Under Rule 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

"To qualify as an expert, the witness must possess such 'knowledge, skill, experience, training or education' in the particular field as to make it appear that his or her opinion would rest on a substantial foundation and would tend to aid the trier of fact in its search for the truth."[13] In general, "a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight."[14] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[15]

---

[10]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[11]*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004).

[12]*Norris*, 397 F.3d at 884 (quoting *Daubert*, 509 U.S. at 597).

[13]*Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304 (D. Kan. 2008) (citing *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004)).

[14]*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (internal quotation marks omitted).

[15]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

"Reliability questions may concern the expert's data, method, or his application of the method to the data."[16] In order to establish reliability, it is not necessary to prove that the expert is "indisputably correct or that the expert's theory is 'generally accepted' in the scientific community," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[17] *Daubert* sets forth a non-exhaustive and non-dispositive list of four factors that the trial court may consider: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[18] In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's gatekeeping inquiry into reliability must be "tied to the facts of a particular case."[19] In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundation.[20] The Court's review is focused "solely on principles and methodology, not on the conclusions that they generate."[21] "[T]he rejection of expert testimony is the exception rather than the rule."[22] The proponent of the expert

---

[16]*United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

[17]*Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) (quoting *Mitchell v. Gencorp., Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)). In *Daubert*, the Supreme Court noted that the lower courts' inquiry into the admissibility of expert testimony was exclusively focused on "'general acceptance,' as gauged by publication and the decisions of other courts." 509 U.S. at 597. The Supreme Court vacated the judgment and remanded the case. *See* 509 U.S. at 598.

[18]*Daubert*, 509 U.S. at 593–94.

[19]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (internal quotations omitted).

[20]*Id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).

[21]*Daubert*, 509 U.S. at 595.

[22]Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments.

testimony bears the burden of establishing its reliability.[23]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[24] The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[25] In this case, the government was given the opportunity to voir dire Mr. Nicely to determine his qualifications at the suppression hearing.[26]

## B.    Steven Nicely

Mr. Nicely testified on the issue of wether the drug dog in this case was reliable and whether the drug dog gave an alert or indication to the smell of drugs in the vehicle on December 15, 2008. The government argues that Mr. Nicely's testimony does not qualify under Rule 702 because his method of evaluating the reliability of drug dogs was "not widely accepted in any community."[27]

### *Qualifications*

At the hearing, the government questioned Mr. Nicely's educational background and competence to express opinions generally on matters of behavioral science. Nicely has been involved with police dogs since 1973. He started in the military police field training dog

---

[23]*United States v. Nacchio*, 555 F.3d 1234, 1245 (10th Cir. 2009).

[24]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[25]*Id.*

[26]Defense counsel raised a similar objection to the testimony of the government's expert witness Kenneth Wallentine, on the basis that Wallentine had little experience training drug dogs for law enforcement and appeared to be a "government advocate" rather than an expert witness. The Court overruled the objection at the hearing and found that, based on the testimony and curriculum vitae of Wallentine's credentials, experience, and training, he was well-qualified to testify as an expert on whether Rony was reliable or gave an alert in this case.

[27]Tr. at 12.

handlers, and in 1974, he worked for the Department of Defense Military Working Dog School. Around 1977, he went to the military work dog supervisors' course, and worked in the military police field with drug detector dogs and patrol dogs until 1979. After completing police training for the State of Texas, he worked at Leon Valley Police Department as a dog handler. He trained professionally in 1989 at the Global Training Academy and trained dogs for law enforcement from 1991–1992. Again, from 1994 – 2006, he returned to Global Training Academy to train dogs. Currently, he owns two businesses: one devoted to training dog behavior modification for pet dogs, and another business devoted to police dog matters. He also consults with attorneys in preparation for court hearings. Nicely estimates that he has trained 750 dogs for law enforcement purposes, and has trained approximately 400 dog handlers. He has testified in over 50 state and federal cases.

Although Nicely does not have a college degree, he has completed twenty-one formal hours in behavioral science and is in the process of completing his associate's degree in behavioral science. He has published approximately four or five articles, including a peer-reviewed article published in the November 2009 issue of the *Journal of Veterinary Behavior*,[28] discussing record keeping and certification procedures for detector dogs.

The Court finds that Nicely has extensive experience in the training of detection dogs and dog handlers for law enforcement purposes. His expertise is largely based on experience, rather than formal education. Although the government noted that Nicely's behavioral sciences degree is not specifically devoted to *canine* behavior, Nicely testified that the behavioral sciences apply to all animals, whether human or canine. The Court is not convinced that a specialized degree in

---

[28]The Court does not find this article in the curriculum vitae that was admitted. During the hearing, the testimony was unclear as to whether the journal was entitled *The Journal of Veterinary Medicine* or *The Journal of Veterinary Behavior*. It was apparently a November 2009 article entitled, "Record Keeping and Certification."

behavioral sciences *as it applies to* drug detection dogs is a necessary prerequisite to providing expert testimony on the relevant issue in this case: the reliability of a drug dog.[29] Nicely's extensive experience, nearly twenty years experience training 750 dogs for law enforcement purposes and approximately 400 dog handlers and dog trainers, as well as his own experience as a dog handler for nearly twelve years, demonstrate the requisite qualification to testify on drug dog detection behaviors and training methods. Nicely's extensive experience as a trainer for Global Training Academy has been well-recognized in the law enforcement community.[30] He remains a licensed law enforcement officer and retains a police instructor license from the State of Texas. The Court finds he is qualified to testify as an expert on drug dog training, handling, and detection.

### *Reliability*

More specifically, the government has objected to the reliability of Nicely's theories on the basis that they are not widely accepted. At the suppression hearing, the government objected:

> Your Honor, I don't see how he can be qualified as an expert. Under 702, he has to show that this is a well accepted standard within the community. Unless they can establish somehow that dog training associations apply this theory, I don't know how he can be qualified as an expert. It's his belief that nobody else applies it in the say [sic] way. He's testified that there's no standard. He simply wants his standard to be the standard. That doesn't make him an expert. That just give him his opinion.[31]

---

[29]*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (noting that, "[a]s long as an expert stays within the reasonable confines of his subject area, our case law establishes a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight") (internal quotations omitted).

[30]Nicely testified that there is no requirement for a trainer to be certified before he can certify drug detection dogs.

[31]Tr. at 26.

In *Daubert*, the Supreme Court expressly held,

> "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence – especially Rule 702 – do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.[32]

Nicely testified that he uses a training method called "operant conditioning," which is based in the behavioral sciences. Under this method, the subject exhibits a behavior and the trainer gives positive reenforcement when the correct behavior is exhibited and negative or no reenforcement when the incorrect behavior is exhibited. Nicely advocates for a thorough record-keeping process – in training exercises, certification processes, and in the field – that would allow another person to reproduce the tests and determine the reliability of a drug detection dog on the basis of well-kept records. He argues that detailed record keeping allows for an objective analysis of reliability. Although most drug dog training certification programs do not use the behavioral sciences as a method of training, Nicely testified that the United States Department of Defense uses such methods to train dogs for drug detection, bomb detection, and general patrol purposes.[33] In fact, Nicely himself uses this method in training and certifying drug detection dogs, and uses a textbook entitled *How Dogs Learn*, which applies the behavioral sciences to dogs, in his courses to train trainers. As the government noted, there is no uniform standards for drug dog certification across the nation. And Nicely testified that there is growing criticism of current drug certification standards. Thus, in a field that lacks uniformity, the government's apparent concern with the novelty of Nicely's method does not overcome the admissibility of his

---

[32]*Daubert*, 509 U.S. at 597.

[33]Tr. at 24–25.

testimony.

In preparation for the suppression hearing, Nicely reviewed the dog training records of Rony from 2005 until 2009, as well as his certification, in order to evaluate Rony's reliability as a drug dog. He also watched the police video from the traffic stop on December 15, 2008, to evaluate the dog handler's methods and the reliability of the alert given by Rony. Nicely never interviewed Rony's handler, James Hughes, but explained that, assuming the records are truthful, they are the most direct source of information on Rony's response rate. Nicely prepared a written report in addition to his testimony.

Nicely bases his opinion on his experience and expertise, as well as his investigation. In this case, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations.[34] Nicely has chosen to train animals on the basis of lessons learned in the behavioral sciences, a discipline that is devoted to the study of human and animal behavior. Because Nicely's "method" does not involve application of any controversial scientific process or theory, the *Daubert* factors are of less utility.[35] Nicely's method is sufficiently reliable for purposes of Rule 702, and the Court denies the government's oral motion with respect to this testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[36] The government was given the opportunity to cross-examine Nicely at the hearing and to present opposing expert testimony.

---

[34]*Kumho Tire*, 526 U.S. at 150 (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)).

[35]*Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304-05 (D. Kan. 2008).

[36]*Id.* at 596.

The Court finds the government's objections go to the weight of Nicely's testimony, rather than its admissibility.

## C.    Expert Testimony at Suppression Hearing

Steven Nicely defined a "well-trained dog" as one that "will only reveal the presence or the absence of drugs, a contraband item."  That means "the animal had to be under the stimulus control of the discriminate stimulus."  Nicely testified that he did not consider Rony to be a "well-trained dog" because, based on his records, he occasionally exhibited a response when the stimulus was not present, and the dog handler did not apply an "extinction training" to eliminate or reduce the probability of repeat behavior.[37]  In other words, when Rony responded incorrectly, the handler failed to do thorough follow-up to correct the problem.  Additionally, Nicely was troubled by Rony's failure to respond to 100 pounds of marijuana.

Nicely noted that a dog will often respond to "novel" smells, which a handler might misconstrue as an alert.  Thus, the handler rushes to a conclusion before the dog makes a final decision on the matter.  Nicely also explained that, with regard to drug detection dogs, motivation cannot be taught.  However, handlers will often use a "scratch box" to intensify the dog's response to a stimulus.

Nicely testified about the Clever Hans Effect on animals.  When incorrectly trained, a dog will look to the handler's actions to determine when to give its response rather than to rely on the presence or absence of the stimulus.  Nicely calls this "subconscious cuing" or "prompt dependency."

---

[37]Nicely explained that extinction training requires the following: "you have to expose the animal to the stimulus that's causing the response and then you have to ignore the response and the animal doesn't get any reinforcement out of that."  But in the process of doing this, the trainer must avoid "extinction burst."  This occurs when the extinction training actually causes the incorrect response to get worse.  If a trainer responds to the "burst" by changing the training method, then the animal's incorrect behavior is not extinguished.

Nicely argued that he was unable to do a thorough review of Rony's reliability because the records supporting his certification were not sufficiently detailed. Nicely stated, "[i]f I can't measure it, then it's speculation."[38] Nicely used figures provided in Rony's field records and calculated a 38% accuracy rate: out of seventy responses, there were only thirty detectable finds (*i.e.*, those actually confirmed).

Nicely reviewed the video of the traffic stop on December 15, 2008. He testified that the dog did not appear to be focused because he was often looking away from the vehicle and the handler was "attempting to jerk the dog over." When the handler bent over toward the opened passenger door, Nicely considered such action "consistent with the gesture of putting the dog in the car." Although Nicely noted that it was not possible to see the dog inside the vehicle, he believed the dog did not exhibit the kind of interest in the car a dog might if he detected something. Nicely testified that he did not believe Rony gave any alert.

Kenneth Wallentine testified on behalf of the government. He worked in private practice and served as a clerk for district court and the appellate court judges. In 1994, he was trained as a dog handler and worked in this capacity until 2001 and has published multiple peer-reviewed articles and books relating to canines. He currently works for the Attorney General for the State of Utah and is a member of the United States Police Canine Association and the California Narcotics Canine Association, as well as an invitation group called the Scientific Working Group on Dogs and Orthogonal Detector Guidelines ("SWGDOG"), which was organized under the Federal Bureau of Investigation and the Department of Homeland Security and Transportation and Safety Administration. He worked with 300 to 400 dogs in a supervisory capacity or

---

[38]Tr. at 93.

through maintenance training and problem solving.

In preparation for the hearing, Wallentine interviewed Deputy Hughes three times, reviewed the training records and field reports for Rony, as well as the incident report and police video from December 15, 2008, and prepared a written report. Wallentine testified that he shared some of Nicely's concerns after reviewing the records, specifically, whether Rony had been proofed off items that had previously served as distractors, such as hotdogs. Wallentine's interview with Hughes resolved many of those questions. Wallentine believed Hughes was candid and forthright as well as humble. Hughes explained that he was receiving ongoing training from other handlers and, through this, he improved his record-keeping practices over time. Wallentine explained that, because animal performance changes over time, the best indicator of present and future behavior is recent past performance. Wallentine testified that the most relevant records in this case are six to twelve months prior to the incident in December 2008. He explained that the most significant event in that time frame was Hughes and Rony's successful certification as a team by HAPDA in October of 2008, only months before the incident. Certification usually occurs annually, and at all times Rony was in service, he was certified.

Wallentine reviewed the certification standards of HAPDA and compared them to standards in other major police dog service organizations across the country and found that HAPDA's standards were consistent with the two largest in the country. Wallentine testified that Rony's certification was based on "single blind testing," in which the handler is unaware whether narcotics are present. Only the judge/evaluator knows what is in the controlled environment. Single blind testing is considered a "best practice" at SWGDOG. Wallentine also testified that Hughes's 16-hours of monthly training was standard practice. Based on "known"

searches in training and certification, Wallentine determined that Hughes and Rony were 92% reliable over the five years prior to the incident; they were 91.74% reliable in the two years preceding the incident. Wallentine stated that reliability determinations are best made on the basis of a dog's training and certification records, because there is no way to determine whether a dog's alert in the field may have accurately identified an odor the officers were unable to confirm.

Wallentine explained that dogs frequently become overwhelmed when exposed to large amounts of narcotics. They are not generally exposed to such large amounts in training or in the field, and they experience sensory overload. Wallentine testified that dual purpose training (for drug detection and patrol use), is not uncommon among dogs and does not make a dog less reliable in itself. Wallentine considers it problematic that Rony was not trained in a *negative* testing environment. That is, Rony was not tested in an environment where drugs were absent.

Wallentine reviewed the video of the traffic stop and noted that air currents were likely shifting during Rony's sniff. The door was closed on the driver's side but was open on the passenger side, and hot air was exiting the car while cold air was entering it. Although Wallentine thought it unnecessary for Hughes to do a second sniff of the vehicle before allowing the dog to enter, he understood that Hughes wanted to be "fair" and do a second check. Wallentine explained that the foam material on the edge of the seat likely absorbed some of the narcotics odor, causing Rony to believe he had found the saturation place in the seat instead of the driver's door.

III.   **Discussion**

Both defendants appear to focus on the following arguments:  (1) the initial stop was unlawful; (2) the detention exceeded the scope and duration of the initial stop, and was

unreasonably prolonged to allow the drug dog to arrive; (3) the drug dog was unreliable and did not provide probable cause to search the vehicle; (4) defendants' arrests were not based on probable cause; (5) the impoundment of the vehicle and the inventory search were unlawful; and (6) evidence obtained was fruit of the poisonous tree. The government argues that Elenes-Mombela does not have standing to challenge the search of the vehicle.

### A.    Initial Stop

Defendants argue the initial stop was unlawful because it was not supported by (a) probable cause or reasonable suspicion to believe criminal activity or a traffic violation had occurred, was occurring, or was about to occur, (b) probable cause to believe evidence of a crime was present in the vehicle, or (c) a valid arrest or search warrant. The government argues that Officer Garcia's subjective motives are irrelevant, and objectively, there was reasonable, articulable suspicion to believe defendants' window tinting violated K.S.A. § 8-1749a(a)(3). Defendants have submitted evidence regarding the tint on the windows, arguing that no reasonable person would have believed the windows violated Kansas' window-tinting statute.

Under the Fourth Amendment, a traffic stop is a "seizure" which is reasonable only if (1) the officer's action was "justified at its inception," and (2) the detention was "reasonably related in scope to the circumstances which justified the interference in the first place."[39]  In *Arizona v. Johnson*,[40] the Supreme Court recently explained that "the first *Terry* condition – a lawful investigatory stop – is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation," and the police need not believe the vehicle

---

[39]*Terry v. Ohio*, 392 U.S. 1, 19-20 (1968).

[40]__U.S.__, 129 S.Ct. 781 (2009).

is involved in criminal activity.[41]  Tenth Circuit cases establish that, before stopping an automobile, an officer must have "an objectively reasonable articulable suspicion" to believe a violation of any "applicable traffic or equipment regulation[]" has occurred or is occurring.[42]  Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[43]  Furthermore, "reasonable suspicion may rely on information less reliable than that required to show probable cause . . . and it need not be correct."[44]  The subjective motives of the officer and the practices of his department are irrelevant in deciding whether a particular stop is reasonable.[45]  The Tenth Circuit has stated, "we rightly leave to the state legislatures the task of determining what the traffic laws ought to be, and how those laws ought to be enforced."[46]

Kansas statute § 8-1749a(a)(3) provides that

> No motor vehicle required to be registered in this state and which is operated on the highways of this state shall be equipped with one-way glass or any sun screen device, . . . and used in conjunction with safety glazing materials that do not meet the following requirements: . . . (3) the total light transmission shall not be less than 35% when a sun screening device is used in conjunction with safety glazing materials or other existing sun screening devices.[47]

Subsection (e)(1) states that "after January 1, 1988, violation of the statute constitutes a

---

[41]*Id.* at 784.

[42]*United States v. DeGasso*, 369 F.3d 1139, 1143 (10th Cir. 2004) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)); *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[43]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[44]*Id.* (internal citations omitted).

[45]*Whren v. United States*, 517 U.S. 806, 815 (1996).

[46]*Botero-Ospina*, 71 F.3d at 788.

[47]K.S.A. § 8-1749a(a)(3).

misdemeanor.[48]

Prior to the statute's amendment, eliminating the word "substantially," the Kansas Supreme Court explained the rationale behind the law:

> By definition the term ["substantially"] is relative and must be considered within the context of the particular fact situation; . . . The statute prohibits motor vehicles from being equipped with one-way glass or other substances applied to the windows . . . which *prohibits or substantially impairs* the ability to see into the motor vehicle from the outside. The gravamen of the offense is clearly the impairment of visibility into the motor vehicle from the outside.[49]

In 2008, the Kansas Court of Appeals explained that an officer's "reasonable suspicion" that a vehicle's windows violate the window-tint law is limited to the facts available to him or her prior to the traffic stop: "'Neither the concepts of probable cause nor "articulable suspicion" would require that an officer have tint meter readings before making a stop for a window tint violation.'"[50] Furthermore, in reviewing a motion to suppress, the Tenth Circuit has stated, "it is not our role to decide whether the present facts are adequate to affirm a conviction under the applicable . . . traffic statute," but to "inquire solely as to whether the facts are adequate to form an objectively reasonable suspicion" that a traffic statute has been violated.[51]

In the present case, the evidence shows that Officer Garcia had an objectively reasonable suspicion that defendants' windows violated K.S.A. § 8-1749a(a)(3), even though defendants were able to perform a subsequent window transparency test with different results than those

---

[48]*Id.* at § 8-1749a(e)(2).

[49]*State v. Rose*, 677 P.2d 1011, 1049 (Kan. 1984).

[50]*State v. Kirk*, 196 P.3d 407, 409 (Kan. Ct. App. 2008) (quoting State v. Polk, 2008 WL 186660, at ¶¶ 18–19 (Ohio Ct. App. 2008).

[51]*United States v. Vercher*, 358 F.3d 1257, 1260 (10th Cir. 2004); *see United States v. Ferro*, No. 2:07CR11DAK, 2007 WL 3125085, at *3 (D. Utah Oct. 23, 2007) (quoting the Tenth Circuit's standard for reviewing "reasonable suspicion" of a window-tint violation).

obtained by Officer Garcia. Defendants have admitted pictures of the windows taken on a sunny day with one or more of the windows rolled down. In the pictures, the light shines through a single window pane well. However, the transparency of a particular set of windows on a particular day depends, to some extent, on a comparison with other vehicles traveling on the roads that day. The Court has reviewed the videotape of the traffic stop taken during the winter months, in the afternoon of December 15, with clouds overhead and all widows rolled up. While weather conditions will inevitably affect an officer's ability to see into a traveling vehicle, the Court notes that a suspected window tinting violation may also be relative to other cars. In deciding whether the officer's suspicions were reasonable, a court is to consider whether the facts "viewed from the standpoint of an objectively reasonable police officer . . . establish a minimal basis for reasonable suspicion."[52] The Court notes that defendants' windows appeared substantially darker than surrounding vehicles traveling on the road that day. When the windows are viewed on the video and the pictures provided by defense counsel, they appear sufficiently dark to form a "reasonable articulable suspicion" that they violated K.S.A. § 8-1749a(a)(3).

Here, Officer Garcia believed the window tinting was "substantially dark," and after approaching the vehicle, Officer Garcia's reasonable suspicions were confirmed when he performed a window transparency test that revealed that the windows permitted only 15% of light to pass through, which is 20% below the 35% limit set by Kansas law. There is a significant difference between the transparency of defendants' windows and the legal limit. Thus, Officer Garcia had a reasonable articulable suspicion of an equipment violation and, on this basis, the stop was justified at its inception.[53]

---

[52]*Vercher*, 358 F.3d at 1262 (internal citations omitted).

[53]*See United States v. Gevorkyan*, No. 2:08-CR-106TC, 2009 WL 197517, at *4 (D. Utah Jan. 27, 2009).

## B.     Scope and Duration of Detention

Even if the initial stop was valid, defendants argue the length and purpose of the stop was extended beyond its initial justification merely to await the arrival of the drug-detection canine. Defendant Elenes-Mombela also argues that the police unlawfully withheld his identification after the checks were performed, and thus, his detention and removal from the car were illegal. The government responds that, because the driver failed to produce a valid driver's license, Officer Garcia had reasonable, articulable suspicion of illegal activity and was permitted to investigate further regarding the driver's identity and whether he had a valid driver's license to operate the vehicle. Because Elenes-Mombela's identification card did not permit him to operate the vehicle lawfully, the officers were permitted to detain the passenger to investigate the driver.

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place."[54]  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[55]  However, in the course of a routine traffic stop, an officer may "request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[56]  An officer may also run a simultaneous check of the detainees' criminal history.[57]  Even an officer who stops a driver for violating "any

---

[54]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[55]*United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[56]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

[57]*United States v. McRae*, 81 F.3d 1528, 1535 n.6 (10th Cir. 1996).

one of the multitude of applicable traffic and equipment regulations of the jurisdiction" may request identification and run a registration check.[58] Furthermore, during a traffic stop, an officer may order the driver and all occupants to exit the vehicle.[59]

Thereafter, "when a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver to proceed without further delay or questioning."[60] An officer is "justified in perpetuating the stop long enough to determine whether the license [is] in fact valid,"[61] but once a driver has produced a valid driver's license, prompt release is required.[62] "A stop generally ends when the officer returns the driver's license, registration, and insurance information."[63] "[F]urther detention for purposes of questioning unrelated to the initial traffic stop is permissible if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring."[64]

---

[58]*United States v. Ramstad*, 308 F.3d 1139, 1144 (10th Cir. 2002) (*quoting United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999)).

[59]*Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998) (citations omitted); *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (holding that, while a vehicle is lawfully detained, the driver and all passengers may be ordered to exit the vehicle).

[60]*Patten*, 183 F.3d at 1193 (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998)).

[61]*United States v. Douglas*, 195 F. App'x 780, 784 (10th Cir. 2006).

[62]*United States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (citing *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir. 1988), *overruled on other grounds by United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995)).

[63]*United States v. Ferro*, No. 2:07CR11DAK, 2007 WL 3125085, at *4 (D. Utah Oct. 23, 2007) (quoting *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir. 1990)).

[64]*United States v. Martinez*, 230 F. App'x 808, 812 (10th Cir. 2007) (citing *United States v. Zumbia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001)). Subjective intentions are irrelevant under the Fourth Amendment. *See Ohio v. Robinette*, 519 U.S. 33, 38 (1996) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). The Sixth Circuit has clearly held that, under this precedent, "continuing to detain a motorist does not become unlawful just because the officer has determined in his own mind not to pursue the traffic violation." *United States v. Garrido*, 467 F.3d 971, 978 (6th Cir. 2006) (quoting *United State v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003)); *United States*

Here, Officer Garcia did not believe the occupants had produced paperwork that would permit them lawfully to operate the vehicle. Although the stop was initiated for a suspected window-tint violation, that purpose changed when Officer Garcia requested the driver's license and Beltran-Palafox produced a Mexican driver's license.[65] Dispatch was unable to locate the license or identify the driver, and the passenger was only carrying a Mexican identification card.

At the time of the traffic stop, Officer Garcia articulated concern that he did not believe Beltran-Palafox's license was valid. Thus, he was permitted to detain defendants further to determine whether the driver, Beltran-Palafox, or the passenger, Elenes-Mombela, could lawfully operate the vehicle.[66] He asked dispatch to run variations of Beltran-Palafox's name, but dispatch stated that nothing was listed that would suggest he had a valid license. The Court finds that, under these circumstances, the duration of the detention was justified by the need to confirm whether the vehicle was being lawfully operated. The duration of the traffic stop, from its inception until Beltran-Palafox's arrest, was approximately twenty-one minutes. Under the totality of the circumstances, the Court finds this period of time was not unreasonable.[67]

---

v. Bohanon, 629 F. Supp. 2d 802 (E.D. Tenn. 2009) (finding that, when viewing the relevant traffic violation objectively, the scope and duration of the seizure was not illegal even though police officer immediately assured driver "I'm not going to write you a ticket or anything," and proceeded to ask questions and run a check).

[65] See United States v. Gevorkyan, No. 2:08-CR-106TC, 2009 WL 197517, at *5 (D. Utah Jan. 27, 2009) (holding that initial stop for a suspected window-tint violation was lawfully expanded into a more general investigation when driver admitted he was driving without a license); United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998) (collecting cases where further detention and questioning was justified to investigate authorization to operate the vehicle).

[66] See United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995) ("[A]n officer may detain a driver until assured that the driver's license is valid and the driver is legitimately operating the vehicle."); United States v. Gevorkyan, No. 2:08-CR-106TC, 2009 WL 197517, at *5 (D. Utah Jan. 27, 2009) ("After discovering that [the defendant] was not carrying a driver's license, Trooper Withers was entitled to determine whether [defendant] even had a valid license or whether either passenger had a valid license and could legally drive the car.").

[67] United States v. Shareef, 100 F.3d 1491, 1501–02 (10th Cir. 1996) (holding that, under the totality of the circumstances, the thirty-minute detention was not unreasonable).

Defendants also challenge Officer's Garcia's decision to call for a canine unit before approaching the vehicle or questioning the occupants. The Tenth Circuit has held that a dog sniff, deployed during a lawful seizure, "is not a 'search' within the meaning of the fourth amendment and therefore an individualized reasonable suspicion of drug-related criminal activity is not required" before the animal is deployed.[68] Because the Court finds the seizure was lawful in this case, Officer Garcia's decision to call for a drug dog was not unlawful.[69]

## C.      Arrest of Beltran-Palafox

Luis Beltran-Palafox challenges the legality of his arrest on the grounds that he had a valid Mexican driver's license to operate the vehicle. Officer Garcia testified that the City of Salina instructed officers that a Mexican driver's licenses was not valid, and Lt. Norton directed Officer Garcia to make the arrest. The government argues alternatively that there was probable cause to arrest Beltran-Palafox for committing a misdemeanor in Officer Garcia's view.

To make a warrantless arrest, there must be probable cause.[70] There is probable cause "when an officer, considering the totality of the circumstances before him, is led to a reasonable belief that an offense has been or is being committed by the suspect."[71] In other words, "[p]robable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person

---

[68]*United States v. Morales-Zamora*, 914 F.2d 200, 203 (10th Cir. 1990).

[69]*See United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998) (noting that individualized reasonable suspicion of criminal activity is not "required to call the canine unit").

[70]*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

[71]*United States v. Allen*, 235 F.3d 482, 488 (10th Cir. 2000) (citing *United States v. Dozal*, 173 F.3d 787, 792 (10th Cir. 1999)).

to believe that the arrestee has committed or is committing an offense."[72]  "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime."[73]  The Tenth Circuit has held that the collective knowledge of officers may, in some circumstances, establish probable cause:

> It is well-established that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights.[74]

The Court is unpersuaded there was probable cause to arrest Beltran-Palafox for driving with a Mexican driver's license.  The government did not cite any authority, state, federal, or municipal, for Beltran-Palafox's arrest on the basis of driving with a Mexican driver's license.[75]  In fact, Officer Garcia stated that a driver traveling through the State of Kansas may lawfully operate a vehicle with a Mexican driver's license.  He explained that he made the arrest upon instructions of Lt. Norton.  However, the government has not produced any facts known to Officer Garcia or other officers from whom he was receiving instructions that would show the

---

[72]*Olsen*, 312 F.3d at 1312 (citing *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

[73]*Cortez v. McCauley*, 478 F.3d 1108, 1116 (10th Cir. 2007).

[74]*United States v. Shareef*, 100 F.3d 1491, 1503 & nn. 4, 5 (10th Cir. 1996); *see United States v. Hinson*, 585 F.3d 1328, 1334 (10th Cir. 2009) (holding that an officer in the field need not be personally aware of the basis for probable cause for a defendant's arrest so long as the officer instructing him to make the arrest had probable cause for the arrest).

[75]Upon the Court's own review of Kansas law, it appears K.S.A. § 8-236(a) specifically exempts certain persons with "a valid license issued to such nonresident in such person's home state or country" from Kansas' motor vehicle drivers' license act.  *See also* K.S.A. 8-1430 (defining "license" and "license to operate a motor vehicle" as including "the privilege of any person to drive a motor vehicle whether or not such person holds a valid license"); *State v. Bowie*, 999 P.2d 947, 951 (Kan. 2000) (noting that a license includes licensed drivers and drivers exempt under 8-236).  The parties have not discussed whether this statute is relevant, but if it should apply, the Court notes that an officer's mistake of law does not support probable cause or reasonable suspicion.  *See United States v. DeGasso*, 369 F.3d 1139, 1145 (10th Cir. 2004).

presence of probable cause for an arrest on the basis of Beltran-Palafox's driver's license. At the suppression hearing, Officer Garcia testified that, when he approached the vehicle, he did not know Luis Beltran-Palafox's identity or destination and he had never before seen the vehicle or its occupants. Furthermore, he did not inquire into these facts during the traffic stop.

Simply put, probable cause is unsubstantiated.[76] There was reasonable suspicion Beltran-Palafox had an invalid license, but that Officer Garcia testified it also might have been valid. Any facts known to the officers are unknown to the Court. The Court declines to speculate whether probable cause to arrest Beltran-Palafox for his driver's license *might* have been established under additional or different facts, when the government has failed to provide *any* facts upon which it relies.

The government, however, has stated an alternative basis for the arrest. It argues that Officer Garcia had probable cause to arrest Beltran-Palafox for violating K.S.A. § 8-1749a(a)(3). United States Supreme Court has held that an officer's subjective reasons for making an arrest "need not be the criminal offense as to which the known facts provide probable cause."[77] In other words,

> The Court explained that the subject intent of the officer – *i.e.*, his reason for making the arrest – cannot be used to invalidate an otherwise legitimate arrest. The correct inquiry is rather whether "the facts known to the arresting officers given probable cause to arrest." . . . [T]he probable cause inquiry is not restricted to a particular offense, but rather requires merely that officers had reason to believe that a crime – any crime – occurred.[78]

---

[76]*See id.* at 1505 ("We emphasize that reasonable suspicion does not amount to probable cause. 'It requires considerably less than proof of wrongdoing by a preponderance of the evidence, but something more than an inchoate and unparticularized suspicion or hunch.'" (internal citation omitted)).

[77]*Devenpeck v. Alford*, 543 U.S. 146, 153 (2004).

[78]*United States v. Turner*, 533 F.3d 1337, 1344 (10th Cir. 2009).

The court's inquiry is "an independent and objective one. Thus an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime."[79]

Officer Garcia had reasonable suspicion to believe there was a violation of K.S.A. § 8-1749a(a)(3), at the time he stopped the vehicle. The law regarding window tinting applies to all motor vehicles "required to be registered in this state and which [are] operated on the highways of this state." After approaching the vehicle and performing a tint test that demonstrated a potential violation, Officer Garcia had probable cause to believe the occupants were in violation of K.S.A. § 8-1749a(a)(3), which is a misdemeanor.[80]

K.S.A. § 22-2401 sets out law enforcement's general powers of arrest. Subsection (d) authorizes an officer to arrest any person for "any crime" committed in the officer's view. The statute only excludes traffic infractions, and cigarette or tobacco infractions.[81] The term "traffic infraction" is defined in K.S.A. § 21-3105(2) as "a violation of any of the statutory provisions listed in subsection (c) of K.S.A. 8-2118 and amendments thereto." The Kansas Court of Appeals has explained that when a statute is not listed among the statutes in K.S.A. 8-2118(c), it is not a traffic infraction.[82] K.S.A. § 8-1749a is not listed among statutes in K.S.A. 8-2118(c). "Therefore, under the plain and unambiguous language of K.S.A. 21-3105(2)," a violation of the window tinting statute is not a traffic infraction, or a cigarette or tobacco infraction, and it is not

---

[79] *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008) ("Central to this analysis is determining which crime, or crimes, defendants could objectively and reasonably have believed that Fogarty committed.").

[80] K.S.A. § 8-1749a(a)(3). The Court notes that, prior to January 1, 1988, a law enforcement officer was required to issue a warning citation for violations of this statute. But after January 1, 1988, violation of the statute was a misdemeanor offense.

[81] K.S.A. § 22-2401(d).

[82] *State v. Cox*, 206 P.3d 54, 56 (Kan. 2009).

excepted under § 22-2401.[83]  The window-tint violation clearly occurred in Officer Garcia's presence and was confirmed by the tint meter.[84]  Thus, the Court finds there was probable cause for Beltran-Palafox's arrest.

Additionally, in *Virginia v. Moore*,[85] the Supreme Court held that when police officers have probable cause to believe a person has committed a crime in their presence, the Fourth Amendment permits a warrantless arrest – and a search incident to that arrest – regardless of whether the crime qualifies as an arrestable offense under applicable state law."[86]  The Court finds that the facts available to Officer Garcia established probable cause to believe Beltran-Palafox had violated K.S.A. 8-1749a(a)(3), justifying his arrest and the search-incident-to-arrest.

### D.      Search of the Vehicle[87]

Defendants argue that no one gave consent to the search of the vehicle, there was no valid warrant, and there was no warrant exception.  They argue the stop was unreasonably prolonged to allow the drug dog to arrive and perform the sniff; furthermore, it was not a valid

---

[83]*Id.* (holing that failure to provide proof of valid motor vehicle liability insurance under K.S.A. § 40-3104(d) is an arrestable offense because it is not a "traffic infraction" as defined by statute).  The United States Supreme Court has upheld K.S.A. § 22-2401, and many like it, under the Fourth Amendment.  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

[84]Defendants appear to argue the tint meter was not reliable because it had not been tested for some months.  The Court was not presented with any evidence to indicate that a tint meter becomes "unreliable" or "inaccurate" after a set period of time.  In fact, no evidence was presented that would inform the Court of particular standards of care that apply to such instruments.

[85]553 U.S. 164 (2008).

[86]*United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009) (citing *Moore*, 553 U.S. at 1608); *see Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  In *Atwater v. City of Lago Vista*, the Court held "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  532 U.S. at 354.  The Supreme Court noted that the Fourth Amendment does not forbid "a warrantless arrest for a minor criminal offense, such as a misdemeanor seatbelt violation punishable only by a fine," if the warrantless arrest is permitted by law.  *Id.* at 323.

[87]Although Elenes-Mombela joined Beltran-Palafox's motion to suppress (Doc. 41), he has not shown any possessory interest in the vehicle or its contents.  As discussed below, the Court finds he does not have standing to challenge the search directly.

search-incident-to-arrest.

The government argues that the drug dog sniff was part of the traffic stop, and he gave a valid alert, therefore, no Fourth Amendment rights were implicated. Alternatively, it argues that the canine was deployed as part of a search-incident-to-arrest under *New York v. Belton*.[88] Because the search occurred before *Arizona v. Gant*[89] was decided, the government asks the Court to apply the good faith exception.

## 1. Search-Incident-to-Arrest

The search-incident-to arrest exception to the warrant requirement is intended to "ensure officer safety and prevent the concealment or destruction of evidence.[90] It may "only include 'the arrestee's person and the area "within his immediate control" . . . mean[ing] the area from within which he might gain possession of a weapon or destructible evidence.'"[91] Since the Supreme Court decided *Arizona v. Gant*, "the scope of a search [incident to arrest] must be strictly tied to and justified by the circumstances which rendered its initiation permissible."[92] Thus, "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."[93] "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to

---

[88]453 U.S. 454 (1981).

[89]129 S. Ct. 1710 (2009).

[90]*Hunnicutt*, 135 F.3d at 1350.

[91]*Arizona v. Gant*, 129 S. Ct. 1710, 1716 (U.S. 2009) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

[92]*United States v. Edwards*, 242 F.3d 928, 937 (10th Cir. 2001) (quoting *Chimel*, 395 U.S. at 762).

[93]*Gant*, 129 S. Ct. at 1723.

believe the vehicle contains relevant evidence."[94]  "[A] search incident to arrest can also precede the arrest if probable cause for the arrest preceded the search (rather than being justified by the fruits of the search)."[95]

In *United States v. McCane*,[96] the Tenth Circuit held that, if the search was performed before the Supreme Court decided *Arizona v. Gant*, on April 21, 2009, then the officers may claim the "good faith" exception to the exclusionary rule so long as their actions conformed to the pre-*Gant* standards for a search-incident-to-arrest.[97]  Prior to *Gant*, under Tenth Circuit precedent, an officer was permitted to search the passenger compartment of a vehicle upon the arrest of a recent occupant, regardless of whether the arrestee was already restrained and regardless of the nature of the offense for which he was arrested.[98]

Here, Officer Garcia lawfully arrested Beltran-Palafox on the basis of probable cause to believe Beltran-Palafox was operating a vehicle with windows that violated K.S.A. § 8-1749a(a)(3).  Because the arrest occurred on December 15, 2008, before the Supreme Court decided *Arizona v. Gant*, the subsequent search of the passenger compartment was a valid

---

[94]*Gant*, 129 S. Ct. at 1719.

[95]*United States v. Sanchez*, 555 F.3d 910, 920 (10th Cir. 2009) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)).

[96]573 F.3d 1037 (10th Cir. 2009).

[97]*See United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009)*.*  In *McCane*, the driver was stopped for violating a state traffic law.  The driver stated that his license was suspended.  The officer arrested him for driving with a suspended license, placed him in handcuffs, and directed him to sit in the back seat of the patrol car.  The officer then asked the passenger to sit next to McCane in the back seat of the patrol car.  When both occupants were in the patrol car, the officer searched the passenger compartment of the stopped vehicle.  A firearm was found.  The car was impounded, the passenger was released, the driver was transported to the police station for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g).  *Id.* at 1039.

[98]*Id.* at 1041 (citing *United States v. Humphrey*, 208 F.3d 1190, 1202 (10th Cir. 2000)).

search-incident-to-arrest under the "good faith exception."[99]  Under the search-incident-to-arrest

exception, an officer is permitted to "search the passenger compartment [as well as] . . . the

contents of any containers found within the passenger compartment" pursuant to a custodial

arrest.[100]  Thus, whether Rony alerted outside the car or inside the car, his entry was a

permissible part of law enforcement's search-incident-to-arrest.[101]

### 2.    Drug Dog Search as Part of Lawful Traffic Stop

Alternatively, the government argues the drug dog sniff did not implicate the Fourth

Amendment because it was a valid part of a lawful seizure.  Use of a drug dog to walk around

the exterior of a defendant's car does not escalate a traffic stop into a search.[102]  Consent is not

required for a dog sniff of a lawfully detained vehicle.[103]  A canine sniff of an already

legitimately detained automobile is not a "search" within the meaning of the Fourth

Amendment.[104]  However, "[a] seizure that is justified solely by the interest in issuing a warning

---

[99]*See United States v. Albert*, 579 F.3d 1188, 1192 n.5 (10th Cir. 2009) (noting that, under similar facts in which the driver was arrested and the passenger was removed from the vehicle to allow officers to perform a search-incident-to-arrest, the pre-*Gant* search would be legal under *McCane*).

Although the parties did not raise this argument, the Court notes that the search was contemporaneous with the arrest.  Beltran-Palafox was arrested.  Within one-and-a-half minutes, he was placed in the back of the patrol car.  One minute later, Officer Garcia removed Elenes-Mombela from the vehicle.  And approximately one-and-a-half minutes after that, Deputy Hughes began the search with Rony: a maximum of four minutes total.  *See United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006) (finding five to sixty minute separation to be "contemporaneous").

[100]*New York v. Belton*, 453 U.S. 454, 460 (1981).

[101]*See United States v. Patterson*, 65 F.3d 68, 71 (7th Cir. 1995) (holding that officer's deployment of a drug dog on a vehicle after the lawful arrest of the driver was a lawful part of the search-incident-to-arrest); *United States v. Thomas*, 787 F. Supp. 663, 684 (E.D. Tex. 1992) (holding that use of dog to search inside of vehicle under the automobile exception was valid as "he acted as a mere extension of the officers' sensory faculties").

[102]*See City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).

[103]*United States v. Diaz-Borjas*, 188 F.3d 519 (10th Cir.1999).

[104]*United Stats v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir.1998).

ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission" and the dog sniff was conducted during the unlawful detention.[105]

The Court previously found that the duration of the traffic stop was not unreasonable. Because traffic stop escalated into an arrest when Beltran-Palafox was seized,[106] and because the drug dog sniff did not occur until after the arrest, the Court sees no reason to evaluate the drug dog search as part of a traffic stop when it was clearly part of a valid search-incident-to-arrest.

### E.    Drug Dog Reliability and Alert

Both defendants have challenged the reliability of drug dog Rony and have challenged whether he gave a valid alert to drugs inside the vehicle.  As discussed below, the Court notes that Elenes-Mombela has not established standing to challenge the search of the car.

### 1.    Reliability

The Tenth Circuit has consistently held that "probable cause can be based on alerts by trained dogs."[107]  However, "the narcotics dog must be 'reliable' or 'trained' in order for an alert to support probable cause."[108]  The party seeking to suppress evidence bears the burden of proving the dog is unqualified.[109]  The U.S. Supreme Court has defined a "well-trained narcotics-detection dog" as "one that 'does not expose noncontraband items that otherwise would remain

---

[105]*Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

[106]*See United States v. Garcia*, 52 F. Supp. 2d 1239, 1244 (D. Kan. 1999) (setting out the three general types of citizen-police encounters under the Fourth Amendment: (1) consensual, (2) investigative detentions, and (3) arrests).

[107]*United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009) (quoting *United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997)).

[108]*Id.* (citing *Kennedy*, 131 F.3d at 1378).

[109]*Id.* (citing *United States v. Moore*, 22 F.3d 241, 243 (10th Cir. 1994)).

hidden from public view.'"[110]  The Tenth Circuit has explained that:

> [W]ith a canine, the reliability should come from the fact that the dog is trained and annually certified to perform a physical skill. When the annual certification process involves actual field testing and grading of the canine's drug-detection skills, the canine's reliability is sufficient for a probable cause determination absent some circumstance that justifies a more complete examination of the canine' skill and performance.[111]

Such a showing could be made if the dog has a poor accuracy record, if the dog's training was substandard, if the dog's health was in question, or if the circumstances of the search caused the Court to question the dog's reliability.[112]

A district court is required, when the issue is raised, to rule on whether the drug dog is reliable.[113]  The Tenth Circuit has held, "[w]hile successful completion of a training course and a current certification would be satisfactory, we do not exclude the possibility that reliability can be established by other evidence."[114]  In *United States v. Kennedy*,[115] the Tenth Circuit commented that a drug dog's alert may not establish probable cause "if the particular dog had a poor accuracy record."[116]  However, the Circuit refused to require an affidavit for a search warrant "to include a complete history of a drug dog's reliability beyond the statement that the

---

[110]*Illinois v. Caballes*, 543 U.S. 405, 490 (2005) (citing *United States v. Place*, 462 U.S. 696, 707 (1983)).

[111]*United States v. Kennedy*, 131 F.3d 1371, 1378 (10th Cir. 1997), *cert. denied*, 525 U.S. 863 (1998) (quoting *United States v. Wood*, 915 F. Supp. 1126, 1136 n.2 (D. Kan. 1996), *rev'd on other grounds*, 106 F.3d 942 (10th Cir. 1997)).

[112]*Wood*, 915 F. Supp. at 1136.

[113]*Clarkson,* 551 F.3d at 1204.

[114]*Id.*  On remand, the district court found this particular drug dog was not reliable because, although be began formal training, he never finished a full certification course.  *United States v. Clarkson*, No. 02:06CR734 DAK, 2009 WL 1651043, at *4 (D. Utah June 10, 2009).

[115]131 F.3d 1371 (10th Cir. 1997).

[116]*Id.* at 1377.

dog has been trained and certified to detect drugs."[117]  The reliability of a drug canine's alert is "normally, though not exclusively, established by presenting evidence regarding the canine's training and certification."[118]  Although certification alone may be sufficient, the Tenth Circuit has also held that a 70–80% successful detection rate would be reliable.[119]

Defendants' expert, Steven D. Nicely, submitted a written report, concluding that Rony was not reliable because his training was inadequate to correct problems with lack of motivation, responses to distractors, false alerts, and failures to detect.  Nicely reviewed Rony's training and performance records, and speculated as to what would causes a drug dog to give a false alert, concluding that a canine would be motivated to give a false alert if he sought positive reinforcement.  Nicely criticizes the handler's records for not indicating when the handler knew the location of the target odor and when he did not, so as to evaluate when "cues" may have been given, and the failure to use terms consistently, such as "alert" and "indicate."

Nicely calculated Rony's "success" rate on the basis of field performance records and noted that, when Rony conducted a search of a vehicle, the probability that drugs would actually be seized was 38.64%.  However, the probability that Rony's "alert" would be confirmed by "claimed finds" (those not confirmed by chemical means but corroborated by other evidence), demonstrates a success rate of 72.73%.

The government's expert, Kenneth R. Wallentine, noted that Rony was certified as a team with Deputy Hughes in October 2008 by the Heart of America Police Dog Association

---

[117]*Id.* at 1377.

[118]*United States v. Bertram*, 307 F. App'x 214, 215 (10th Cir. 2009).

[119]*Id.* at 217 (citing *Kennedy*, 131 F.3d at 1378).  *United States v. Kennedy* specifically held, "We find that a 70–80% success rate meets the liberal standard for probable cause established in [*Illinois v.*] *Gates*[, 462 U.S. 213, 238 (1983)]."  131 F.3d at 1378.

("HAPDA").  They were certified in the detection of the odors of illegal controlled substances. The certification was valid for one year, and HAPDA maintains standards "that are reasonably stringent and are consistent with the principal national and regional police canine associations." Furthermore, Wallentine stated that Rony's regular training regimen "meets or exceeds generally accepted training standards for maintenance of a drug detection dog," Deputy Hughes was "particularly well-qualified to perform drug detection dog odor detection maintenance training," and Hughes maintained very candid records about Rony's performance deficiencies.  Although Mr. Wallentine noted problems with the records Deputy Hughes maintained in 2005 and 2006, he interviewed Deputy Hughes and Hughes explained that he received additional instruction on preparing and maintaining records which he incorporated thereafter.  In reviewing the two years prior to the December 15, 2008 search, Wallentine determined that Rony was successful in detecting the odor of controlled substances and locating those controlled substances in 91.74% of training exercises.

The Court finds, based on the entire record, Rony was adequately trained, well-certified, and in good health at the time of the search.  Rony's records indicate Deputy Hughes and Rony were certified as a team at the time of the search on December 15, 2008.  The certification was only 90-days old, at most, and came from an association well-respected in the Midwest. Furthermore, his annual certification between 2003 and 2008 was never revoked.  His testing was done with "single blind" tests that are considered a "best practice" by SWGDOG, and he was in good health at the time of the search.  Assuming Nicely's calculations are correct, the accuracy of Rony's alerts on the field demonstrated 72.73% success, although the officers were

likely unable to gather sufficient information to evaluate Rony's performance in every case.[120]

Furthermore, the government's expert has shown that Rony was 91.74% accurate in training sessions for two years prior to the December 15, 2008 search. Rony and Hughes trained regularly, approximately sixteen hours every month. Thus, the defense has not met its burden of showing Rony was "unqualified." The Court finds he was certified and reliable at the time of the December 15, 2008 search.

The Court finds that it cannot accurately evaluate a drug dog's reliability on the basis of field records alone. A working environment is not controlled, thus, odors the dog may detect may not be discovered or identified by law enforcement officers.[121] Because the controlled testing environment is the best way to measure a drug dog's reliability, and because Rony's accuracy averaged over 90% on the basis of his training records, the Court finds he was reliable.

Although Elenes-Mombela has not established standing to challenge the search of the vehicle in this case, he argues that various entries in Rony's training and field records demonstrate that Rony lacked motivation or failed to identify drugs that were present.[122] However, it is apparent that these entries span a four-year period.[123] Dogs are not machines and,

---

[120]*See United States v. Soto-Alanis*, No. 07-40149-JAR, 2008 WL 1884118, at *5 (D. Kan. Apr. 28, 2008) (finding drug dog reliable even though he had a 71% accuracy rate).

[121]*See United States v. Kennedy*, 131 F.3d 1371, 1375 n.6 (10th Cir. 1997), *cert. denied*, 525 U.S. 863 (1998) ("A false alert occurs when no seizable amounts of contraband are located during a search. However, a false alert does not mean necessarily that the dog alerted without detecting any odor of narcotics. Dogs are capable of detecting narcotics residue that may appear on money or clothing that has come in contact with drugs, even though no seizable quantity has been found.").

[122]Doc. 100 at 4–6.

[123]Although Elenes-Mombela does not have standing to challenge the search of the vehicle, he has provided a critique of the training and performance records. The Court does not find a consistent pattern of unreliability in the entries identified by defendant. Defense counsel notes three instances in January 2005, one instance in April 2005, two instances in 2006, three instances in 2007 and two instances in 2008 in which Rony failed to detect the presence of a substance. Defense counsel also notes Rony made false alerts on three occasions in 2006 and one occasion in 2005. The Court is unable conclude by that, by connecting a short list of problems over a four year period, defense

as Nicely, Wallentine, and Hughes all testified, occasional lapses are to be expected. In fact, Wallentine noted the candor with which Hughes made his reports. The entries identified by defendants do not reveal a consistent pattern of error or unreliability. Defense counsel has not identified such a severe problem with performance in the field so as to undermine Rony's certification only months before the incident on December 15, 2008.[124] The Court finds Rony was reliable at the time of the traffic stop on December 15, 2008.

### 2. Alert

Defendants argue Rony never gave an alert. Because the Court finds there was a valid arrest, the search of the interior of the vehicle was a valid search-incident-to-arrest. Thus, the issue at this point is whether Rony gave any kind of alert to the vehicle.[125]

---

counsel has demonstrated by a preponderance of the evidence that Rony was unreliable. *See United States v. Clarkson*, 551 F.3d 1196, 1203 (10th Cir. 2009).

[124]Defense counsel also notes various entries in Rony's records where Hughes placed Rony's nose against the source so as to direct Rony's attention. Defense counsel argues that this method taught Rony to respond to "cues." Hughes testified that Rony was not directed to alert, when this was done, but rather to focus his attention on a particular area.

[125]The government has posed, alternatively, that Rony's search of the vehicle was a valid part of the traffic stop, and thus, did not implicate the Fourth Amendment. The Court declines to address the government's argument on this basis, as the video demonstrated that Officer Garcia had completed the background checks of both defendants and was awaiting another officer before performing the arrest. The drug dog sniff occurred only after the traffic stop had escalated into an arrest, and Beltran-Palafox had been taken into custody. Thus, the sniff does not appear to have been part of the traffic stop, so much as it was part of a search-incident-to-arrest.

Therefore, defendants' arguments that Rony should be required to give an alert to the exterior of the vehicle before jumping into the vehicle would only be relevant if Rony's search was part of a *Terry*-type traffic stop. Tenth Circuit cases on this issue, *United States v. Vazquez*, 555 F.3d 923 (10th Cir. 2009), *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998), *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989), involve drug dog searches that take place on the outside of a vehicle during a lawful detention, and because dog gave a valid alert, the Court found it lawful. In such a setting, the Tenth Circuit has set parameters for when a dog may enter the car before he has given an alert to the outside of the car, thus, bringing the dog's search within the parameters of the Fourth Amendment. Because the traffic stop in this case had already escalated into an arrest, the Court does not find it necessary to evaluate the drug dog search as part of a traditional traffic stop. *But see United States v. Hunnicutt*,135 F.3d 1345 (10th Cir. 1998) (holding that post-arrest drug dog sniff was a valid part of the traffic stop, and because dog gave a valid alert, the Court found it lawful and declined to decide whether it was within the search-incident-to-arrest exception). Nevertheless, as noted above, the Court finds that Elenes-Mombela left the front passenger door open when he exited; Hughes deployed Rony only one-and-a-half minutes later; and Hughes' credible testimony establishes that Rony's reaction at the front passenger door was an alert to the inside of the vehicle, such that, after restraining him the first time, Hughes allowed him to

As noted above, under Tenth Circuit precedent, an alert by a trained narcotics-detecting dog is sufficient to establish probable cause for a search.[126] The Tenth Circuit has explained the different types of signals a drug dog is trained to give when it smells narcotics. A dog gives a general "alert" when its physical reaction symbolizes the general presence of an odor it is trained to detect.[127] This is usually followed by an "indication,"[128] where, at the end of a search, "the dog through its physical characteristics and natural abilities pinpoints that exact location of where the odor is coming from."[129] A passive indicator may sit to indicate the presence of drugs, while an aggressive indicator often barks, scratches or bites. Although an "indication" is the ideal outcome of a drug-dog sniff, a drug-dog sniff does not have the precision of a "surgeon working with [a] scalpel,"[130] and the Tenth Circuit has held an "alert" is sufficient to establish probable cause for a search.[131] Thus, a trained dog's change in behavior that is intended to indicate the general presence of contraband will establish probable cause to search.[132]

Defense counsel argues the dog's alert was indeterminate because he had to circle the vehicle more than once, was "distracted" by a bag of food during the search, and the handler

---

enter upon the second pass.

[126]*United States v. Stewart,* 473 F.3d 1265, 1270 (10th Cir. 2007); *United States v. Woods, III*, No. 08-3245, 2009 WL 3262018, at *3 (10th Cir. Oct. 13, 2009) ("Probable cause for such a search exists, among many other circumstances, when a reliable or trained drug dog 'alert[s] to the odor of an illegal substance in the vehicle.'"); *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1994).

[127]*United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009) (noting that dog stiffened and his breathing became more rapid); *see United States v. Forbes*, 528 F.3d 1273, 1276 (10th Cir. 2008).

[128]*Parada*, 577 F.3d at 1281.

[129]*Id.*; *see Forbes*, 528 F.3d at 1276.

[130]*United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004).

[131]*Parada*, 577 F.3d at 1282.

[132]*Id.* at 1282.

45

"cued" him to alert. Defendants' expert argues the dog did not alert before it was permitted to enter the vehicle. Nicely speculated that Hughes did not allow Rony to enter the vehicle when Rony initially approached because he did not give an "alert," but merely demonstrated "interest." Nicely specifically noted a particular incident on October 31, 2004 when Deputy Hughes recorded that Rony wanted to enter the vehicle but Hughes was not sure "why" and added the following note: "maybe he just wanted to go in the van and sniff around." In a search on December 25, 2004, the "k9 showed interest on the driver's door. Search of van revealed nothing." Nicely criticizes the handler for not calculating, on a monthly basis, the probability that Rony's response would actually produce drugs.

Nicely reviewed the video of the December 15, 2008 search, and argued that Rony failed to exhibit any behaviors outside the vehicle consistent with having detected a target odor inside the vehicle. More specifically, Rony is not seen giving an "alert" outside the *driver's side door* where the contraband was located. Furthermore, when the handler opened the driver's side door, Rony rushed into the passenger compartment without sniffing the door panel.

The government argues that Elenes-Mombela left the passenger door open when he exited the vehicle. The first time the handler circled the vehicle, the dog wanted to enter through the passenger door (which the handler called a "change of behavior" and interpreted to mean the interior of the car contained the odor of a controlled substance), but the handler prevented him from entering. Wallentine noted that Hughes' observations would have been sufficient to permit Rony to enter the car and "work toward the source," but Hughes chose to circle the vehicle before doing so. On a second pass around the vehicle, Hughes permitted Rony to enter the open front passenger door and Rony began biting and scratching at the front driver's side seat. When Rony entered the back passenger door, he scratched at the back of the driver's seat. And when

Hughes allowed Rony into the driver's side door, Rony again scratched at the driver's seat. Although the drugs were housed in the driver's side door panel, Wallentine noted that the smell may have been strongest in the fabric of the seat cushions only inches from the door. Wallentine testified that he saw no evidence of any "cues" given by Deputy Hughes. The government argues the handler did not orchestrate the dog's entrance into the vehicle, as the front passenger door was already open and the dog chose to enter and scratch/bite at the driver's side seat.

The Court finds that, based on the evidence from the video, the incident report, and Hughes' testimony, Rony gave a valid alert. In his "Incident Detail Report" from December 15, 2008, Hughes stated as follows:

> [T]he passenger opened the door . . . When the passenger exited the vehicle, he did not close the passenger door. . . .
>
> . . . When the K-9 got to the open door, he looked into the car and took a few steps to go in it. I did not let the K-9 go in the car and continued to walk around the outside with the K-9.
>
> On my second walk around, the K-9 stopped at the open door and wanted to go inside. Knowing my K-9 does not want to go in the interior of a vehicle unless he smells the odor of a narcotic, I let the K-9 inside.
>
> The K-9 immediately went to the driver's side front door and started to scratch and bite at the seat. I told my K-9 to continue the search and he went to the driver's floor and started the scratch.[133]

This case is similar to *United States v. Parada*,[134] the defendant challenged the alert on the basis that there was no "final indication." The canine's body stiffened and his breathing became more deep as he came to the driver's window, but as the canine sought to jump into the

---

[133]*See* Government's Exhibit 2, "Canine Training Records."

[134]577 F.3d 1275 (10th Cir. 2009).

vehicle, his handler prevented him from doing so.[135]  The Tenth Circuit held that "probable cause was satisfied by Rico's alert to the odor of an illegal substance in the vehicle and that it was not necessary for the dog to indicate the exact source of the odor."[136]  The court refused to adopt a stricter rule that would demand a canine to give a "final indication" to location-specific drugs.[137]

Here, Hughes testified that Rony sought to enter the vehicle the first time they passed the front passenger door, but he restrained him to make a full circle around the outside of the vehicle before allowing him to enter.  Defendants' argument that Rony failed to "alert" to the driver's door is without merit.  As the Tenth Circuit has previously held, it is not necessary "for the dog to indicate the exact source of that odor."[138]  Deputy Hughes reported that "my K-9 does not want to go in the interior of a vehicle unless he smells the odor of a narcotic."  The police video does not capture Rony's reaction at the passenger's side door.  However, the Court finds that Deputy Hughes kept candid reports and he was in the best position to read and interpret his canine's reaction. Thus, the Court finds that the "change in behavior" identified by Hughes was an "alert" as defined by the Tenth Circuit.  Furthermore, Rony's alert inside the vehicle, by scratching and biting, was sufficient to establish probable cause to search the vehicle.

Nicely testified that he did not believe Rony gave any kind of alert because he did not exhibit signs of interest in the vehicle on the outside that would indicate the presence of contraband on the inside.  Nicely's opinions were based on Hughes' written reports and the video tape, which did not capture events inside the vehicle.  Rony and Hughes were trained as a

---

[135]*United States v. Parada*, 577 F.3d 1275, 1279 (10th Cir. 2009).

[136]*United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009).

[137]*Id.* at 1282–83.

[138]*United States v. Parada*, 577 F.3d at 1282 (10th Cir. 2009).

team.  Furthermore, the Court finds Hughes's testimony was credible and his familiarity with

Rony's behavior patterns were of significant probative value.  Hughes testified and recorded that

he witnessed Rony's behavior change, which he interpreted to mean narcotics were inside the

vehicle.  Thus, the Court finds that Rony gave an alert outside the vehicle as well as inside the

vehicle on December 15, 2009.

### F.    Inevitable Discovery

The government argues that, even if the drug dog search was unlawful, the drugs would

inevitably have been discovered as part of a standard inventory of the vehicle and its contents

after it was impounded.  The inevitable discovery doctrine "provides an exception to the

exclusionary rule and permits evidence to be admitted if an independent, lawful police

investigation inevitably would have discovered it."[139]  The government bears the burden of

showing "by a preponderance of the evidence that the evidence at issue would have been

discovered without the Fourth Amendment violation."[140]  If evidence is seized unlawfully during

a roadside search, the evidence would be admissible if it "would have been inevitably discovered

in a subsequent inventory search."[141]

Generally, in arguing "inevitable discovery," the government may rely on a hypothetical

inventory search.[142]  Here, however, an actual inventory took place.  Because the Lincoln Town

Car was impounded and the contents of the driver's side door panel was found during an

---

[139]*United States v. Martinez*, 512 F.3d 1268, 1273 (10th Cir. 2008) (quoting *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005)).

[140]*Id.*

[141]*Id.* (quoting *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003)).

[142]*United States v. Martinez*, 512 F.3d 1268, 1274 (10th Cir. 2008) (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)).

inventory search by Greg Swanson, Beltran-Palafox has challenged the impoundment of the vehicle and the inventory search directly, rather than through the inevitable discovery doctrine. He argues that the officers' decision to impound the vehicle was unlawful, and the subsequent inventory search was invalid because it did not involve standardized criteria.[143]

### 1.    Impounding the Vehicle

Beltran-Palafox argues the officers should have given Elenes-Mombela the opportunity to call his girlfriend to pick up the vehicle rather than to impound it.  The government argues the vehicle was seized because there was probable cause to search its contents on the basis of Rony's alert; alternatively, it argues the vehicle was impounded because both the driver and the passenger had been arrested.

Officers may search a lawfully impounded vehicle pursuant to a departmental policy.[144] The validity of the search under this theory requires a two-part analysis.  First, the car must be lawfully impounded.  Under Kansas law, "[i]f police do not have express authority to impound a vehicle, they may still take lawful custody of a vehicle when there are reasonable grounds for impoundment."[145]  The Kansas Supreme Court has explained that "[i]f a person responsible for a

---

[143]Elenes-Mombela also challenged the impoundment of the vehicle, but did not challenge the inventory search.  Elenes-Mombela argues he should have been permitted to arrange for someone to pick up the car, but the Court notes that Elenes-Mombela has not shown any possessory interest in the vehicle or demonstrated that he was authorized to make decisions about its care.  Furthermore, there is no evidence that the driver, Beltran-Palafox, ever asked to make alternative arrangements, and likely would not have been permitted to do so prior to the completion of the search-incident-to-arrest.  Most importantly, Beltran-Palafox was lawfully under arrest and there is no evidence that Elenes-Mombela had a valid driver's license to operate the vehicle.  The Tenth Circuit has noted that "the police are not required to release a vehicle when there is no licensed driver to attend to it."  *United States v. Shareef,* 100 F.3d 1491, 1508 (10th Cir. 1996) (citing *United States v. Harvey*, 16 F.3d 109 (6th Cir.), *cert. denied*, 513 U.S. 900 (1994)).  Furthermore, in addressing a case where defendants failed to "produce a valid license, registration or proof of legal entitlement to the vehicles," the Court held that "law enforcement officers may impound an automobile until the ownership of the vehicle can be ascertained."  *Id.* (citing *United States v. Long*, 705 F.2d 1259, 1262 (10th Cir. 1983)).

[144]*Colorado v. Berntine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1976).

[145]*State v. Teeter*, 819 P.2d 651, 653 (Kan. 1991) (internal quotations omitted).

vehicle desires that the vehicle be left lawfully parked upon the streets or turned over to some other person's custody, then *absent some other lawful reason for impounding the vehicle*, his or her wishes must be followed."[146]  There are several circumstances in which impoundment is justified, including when the vehicle is "used in the commission of a crime when its retention as evidence is necessary."[147]

Here, the driver had been lawfully arrested and the passenger lacked a valid driver's license to operate the vehicle.  More importantly, after Rony alerted to the vehicle under a lawful search-incident-to-arrest, the officers had probable cause to believe the vehicle contained evidence of drug crimes.  Because the vehicle contained evidence of a crime, the officers were not required to consider alternatives to impoundment.

## 2.    Inventory Search of Impounded Vehicle

The second step of the analysis is whether the inventory search was conducted pursuant to valid departmental policy setting forth standardized criteria.[148]  The Tenth Circuit has explained that a lawful inventory search is intended to promote three administrative purposes: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger."[149]  "Although inventory searches need not be supported by a warrant or probable cause," the Tenth Circuit has explained that "they are restricted in other ways":

---

[146]*Id.* (citing *State v. Fortune*, 689 P.2d 1196, 1203 (Kan. 1984)) (emphasis added).

[147]*Id.* at 654 (citing *State v. Boster*, 539 P.2d 294 (Kan. 1975)).

[148]*Colorado v. Bertine*, 479 U.S. 367, 374 n.6 (1987).

[149]*United States v. Martinez*, 512 F.3d 1268, 1274 (10th Cir. 2008) (quoting *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003)).

First they are reasonable only if conducted according to standardized procedures. Second, the police or practice governing inventory searches should be designed to produce an inventory, in other words, an inventory search must be justified by the administrative purpose of such searches.[150]

Beltran-Palafox has argued that the inventory search in this case was invalid because it was not conducted pursuant to standardized criteria, and there was no indication that the search was intended to protect the officers or the contents of the vehicle. Officer Garcia testified that the Saline County Sheriff's Department had a policy that, whenever a vehicle was impounded, towed, or seized, the vehicle was inventoried and all items inside the vehicle are to be noted on an inventory sheet. But no evidence or exhibits were presented on any policies. Neither Officer Garcia nor Swanson described the policy; instead, they described how they routinely performed such inventory searches. They both testified that they routinely searched vehicles that were impounded, and that they routinely checked the door panels because they knew from their narcotics training that drugs might be stored there. In this case, consistent with these routine practices, they searched the control panel of the driver's door.

Of course, as analyzed above, officers could lawfully impound and search the vehicle, having probable cause to believe that the vehicle contained evidence of drug crimes. the government has argued Rony's alert to the vehicle established probable cause to justify a thorough search of the vehicle for evidence of drug crimes. Officer Garcia and Deputy Hughes both testified that the temperatures on that day were well below freezing and the vehicle was moved before it was to be searched.

The United States Supreme Court has stated that "the justification to conduct such a

---

[150]*United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (internal citations and quotation marks omitted).

warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with . . ."[151]  In fact, the Court has upheld searches based on probable cause that were conducted on a vehicle in police custody three days after its impoundment.[152]  In *Florida v. Meyers*,[153] the Court held that a search conducted eight hours after an inventory search at the scene of the arrest was a valid search based on probable cause.

Regardless of the classification by the officers in this case, it is without doubt that Officer Swanson's search was justified by probable cause.  After Rony gave an alert at the scene of the traffic stop and arrest, the officers had probable cause to search the entire vehicle.  The object of the search, drugs, could have been located anywhere within the interior of the vehicle, and was not limited to the area on which the dog alerted.  Supreme Court precedent makes clear that once probable cause is established to search a vehicle, that search may, related to the object sought, extend to all parts of the vehicle and all containers therein.[154]

Rather than to search the vehicle in the bitter cold, the vehicle was transported to the police station.  Investigator Feldman informed Officer Swanson of the alert to the vehicle, and Swanson testified that he began the search at the driver's door.  Within minutes of opening the

---

[151]*Michigan v. Thomas*, 458 U.S. 259, 261 (1982).

[152]*United States v. Johns*, 469 U.S. 478, 483–88 (1985); *see United States v. Sharp*, No. 02-400062-01-JAR, 2002 WL 31027908, at *3 (D. Kan. Sept. 2, 2002) ("Additionally, a search that is based on probable cause is still valid if done at a later time.  Probable cause to search the car does not disappear if it is moved and searched later.").

[153]466 U.S. 380 (1984) (citing *Thomas*, 458 U.S. 251).

[154]*See United States v. Ross,* 456 U.S. 798, 825 (1982) ("If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search").

door, he noticed the control panel on the door was extremely loose such that it could be moved with his fingers, and the panel contained non-factory screws and fresh tool markings, which in his training and experience, was indicative of hidden contraband.  The probable cause had not vanished at this point, but more likely had intensified on the basis of new facts.  Therefore, the Court need not decide whether the inventory search comported with the department's policies and procedures, for in this case, the search of the door panels was justified on the basis of probable cause.[155]  Notably, the door panel was loose enough that Officer Swanson could remove the panel with his fingers, for although the wires were still attached, the non-factory screws did not tightly affix the panel in place.  The fact that there were non-factory screws and that the door panel was not tightly affixed were indicative that the door panel was used as a compartment.  Thus, even if this were an inventory search rather than a search based upon probable cause, the search is distinguishable from the inventory search in *Lugo*, where the officers had to pry open a door panel.[156]

### G.    Elenes Mombela

Elenes-Mombela challenges the initial traffic stop, the subsequent detention, his arrest, and the search of the vehicle.  The government argues that Elenes-Mombela lacks standing to challenge the search of the vehicle because he has not shown (1) a reasonable expectation of privacy in the vehicle or its contents, and (2) assuming there was an unlawful detention, he has

---

[155]*See United States v. Lugo*, 978 F.2d 631, 637 (10th Cir. 1992) (holding that inventory search was not valid, but noting that the more invasive search into the door panels might have been justified on the basis of probable cause, however, the Circuit noted that the parties did not raise this argument on appeal).

[156] *See United States v. Martinez*, 512 F.3d 1268, 1274 (10th Cir. 2008) (drawing a distinction between an inventory search of "compartment that had a crack with some duct tape coming out . . . with just this little opener things [sic]," from the inventory search in *United States v. Lugo*, 978 F.2d 637,  where the officers pried open a door panel, noting "We need not belabor the point that opening a visible storage compartment is different from prying open car door panels not meant to be opened.")

not shown "but for" causation between the illegality and the subsequent discovery of evidence.

### 1. Standing to Challenge the Stop, Detention, or Search

Under *Brendlin v. California*,[157] a passenger of a vehicle subject to a traffic stop has standing to challenge the initial stop, his own seizure, and any evidence derived from that seizure.[158] It does not follow that a passenger has standing to contest the search of the vehicle itself when that person lacks a possessory or property interest in the vehicle.[159] "A defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched."[160] To show a reasonable expectation of privacy in a vehicle, "the defendant bears the burden at the suppression hearing to show a legitimate possessory interest in or [a] lawful control over the car."[161] Defendant "must at least state that he gained possession from the owner or someone with the authority to grant possession."[162] If defendant claims at the suppression hearing that he lawfully borrowed the car from the registered owner, that is sufficient to show standing.[163]

Elenes-Mombela never produced any evidence to demonstrate a reasonable expectation of privacy in the Lincoln Town Car. Beltran-Palafox was the driver, and before the traffic stop occurred, Officer Garcia was advised the vehicle was registered to an individual named "Luis

---

[157] 551 U.S. 249 (2007).

[158] *Id.* at 257; *see also United States v. Martinez*, 537 F. Supp. 2d 1153, 1156 (10th Cir. 2008).

[159] *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1206 (10th Cir. 2007).

[160] *United States v. Shareef*, 100 F.3d 1491, 1499 (10th Cir. 1996).

[161] *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

[162] *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990).

[163] *United States v. Miller*, 821 F.2d 546, 548–49 (11th Cir. 1987) (collecting cases).

Beltran." Elenes-Mombela has not argued otherwise. Although Elenes-Mombela asked to have his girlfriend pick up the car, he did not demonstrate any possessory interest in the vehicle. Based on the entire record, the Court finds he was merely a passenger. Thus, without a possessory interest in the vehicle itself or any containers within the vehicle, Elenes-Mombela does not have standing to challenge the search of the vehicle.

Furthermore, as noted above, the Court finds that the stop and the detention were lawful. Although Elenes-Mombela challenges his removal from the vehicle, it is well-established that, during a traffic stop, an officer may order the driver and all occupants to exit the vehicle.[164] Therefore, the Court finds no Fourth Amendment violation on this basis. Therefore, the Court next considers Elenes-Mombela's challenge to his arrest.

## 2. Probable Cause for Arrest

As noted above, the search of the vehicle was a valid search-incident-to-arrest, at which point, Elenes-Mombela was asked to exit the vehicle during the drug dog sniff. During this, he was questioned about the driver's identity. When he insisted the driver was "Oscar," the officers arrested him for obstruction. Elenes-Mombela argues the government has not produced any facts showing probable cause for an arrest on this basis.

K.S.A. § 21-3808 states that "[o]bstructing legal process or official duty is knowingly and intentionally obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant,

---

[164] *Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998) (citations omitted); *Maryland v. Wilson*, 519 U.S. 408, 410 (1997) (holding that, while a vehicle is lawfully detained, the driver and all passengers may be ordered to exit the vehicle).

process or order of a court, or in the discharge of any official duty."[165]  Kansas courts have found

that "obstruction" occurred when a defendant gave a false identity "in response to a direct

question by a police officer during the course of a criminal investigation."[166]  In *State v. Latimer*,

however, the defendant gave a false name for himself, not a third person.[167]  The Kansas

Supreme Court has held that "a violation of K.S.A. 21-3808 could involve dishonesty or a false

statement, depending upon the facts of each case."[168]  The defendant must have "reasonable

knowledge he is opposing a police officer," and his "obstruction" must be knowing and

willful.[169]  "The critical inquiry is not whether the [defendant] actually committed the crime at

issue, but whether the police had probable cause to believe that he did."[170]

"Probable cause exists if facts and circumstances within the arresting officer's knowledge

and of which he or she has reasonably trustworthy information are sufficient to lead a prudent

person to believe that the arrestee has committed or is committing an offense."[171]  Generally,

there is "probable cause" to believe "obstruction" has occurred when the officers have sufficient

facts available to them to believe the individual is knowingly and willfully expressing a

---

[165]K.S.A. § 21-3808(a).  Although neither party cited this statute, the Court assumes this is the law they are referring to.

[166]*State v. Latimer*, 687 P.2d 648, 653 (Kan. 1984).

[167]*Id.*

[168]*State v. Bowman*, 850 P.2d 236, 241–42 (Kan. 1993).

[169]*State v. Lee*, 744 P.2d 845, 848–49 (Kan. 1987).

[170]*McCormick v. City of Lawrence*, 325 F. Supp. 2d 1191, 1203 (D. Kan. 2004).

[171]*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citing *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)).

falsehood in response to a criminal investigation.[172]  "Although probable cause does not require facts that establish certain guilt, it does require more than mere suspicion on the part of the officer making the arrest."[173]

Elenes-Mombela argues that he did not commit any traffic infraction, and there was no evidence that he did not believed the driver was named "Oscar."  The only officer from the scene to testify at the suppression hearing was Officer Garcia.  He testified that he did not know the individuals in the vehicle or their relationship to each other.  Officer Feldman asked questions of Elenes-Mombela in English, but Officer Garcia did not translate.  Furthermore, Officer Garcia did not make the decision to arrest Elenes-Mombela.  On the video recording, an unidentified officer can be heard repeating "Don't lie to me," and Elenes-Mombela can be heard to answer "Oscar."  However, the Court has no other evidence of facts supporting probable cause for an arrest on the basis of "obstruction."  Of all the evidence presented at the suppression hearing, the government did not present evidence of what the officers knew, or believed they knew, about these defendants prior to the traffic stop.  Beltran-Palafox's driver's license indicated that his name was "Oscar," consistent with Elenes-Mombela's statement.  Furthermore, there was no evidence that a positive identification of Beltran-Palafox was made at the scene or at the time of Elenes-Mombela's arrest, such that falsehood might be imputed.  If the officers had a factual basis to believe Elenes-Mombela's answer was not merely incorrect, but purposeful deception, the Court was never made aware of it.  Officer Garcia testified that Investigator Feldman

---

[172]*Allen*, 235 F.3d at 485–86, 488 (holding that the officer could reasonably infer that the defendant was using a false name because defendant later called his brother by the same name); *Demster v. City of Lenexa, Kan.*, 359 F. Supp. 2d 1182, 1186 (D. Kan. 2005) (holding that "the accused must have willfully and knowingly hindered or obstructed the officer").

[173]*Ramos v. Carbajal*, 508 F. Supp. 2d 905, 915 (D.N.M. 2007).

mentioned something about the nickname "Lordy," but there is no evidence attaching that name to either defendant. Thus, the Court is not in a position to find there was probable cause to believe Elenes-Mombela committed "obstruction" solely on the basis of giving an "incorrect" answer.

Nevertheless, the Court notes that once Rony gave a positive alert to the vehicle, the officers had probable cause to believe a drug crime had been or was being committed, and thus, had probable cause to arrest both Beltran-Palafox and Elenes-Mombela on that basis.[174] In *United States v. Anchondo*,[175] the Tenth Circuit held that a canine's alert to the inside of the defendant's car "provided the probable cause necessary to arrest the defendant."[176] Thus, Elenes-Mombela's arrest was valid on that basis.[177]

---

[174]*United States v. Anchondo*, 156 F.3d 1043, 1045–46 (10th Cir. 1998).

[175]156 F.3d 1043, 1045–46 (10th Cir. 1998).

[176]*Id.* at 1045; *see United State v. Garcia*, 52 F. Supp. 2d 1239, 1253 (D. Kan. 1999) ("Even in the absence of the other information known by the troopers, once the drug dog alerted on the two vehicles, the troopers had probable cause to arrest Garcia and the other occupants of the two vehicles."); *United States v. Shayesteh*, 166 F.3d 349 (Table), 1998 WL 839083, at *6 (10th Cir. 1998) ("An alert by a certified narcotics sniffing dog provides probable cause for a search and arrest); *United States v. Williams*, 726 F.2d 661, 663 (10th Cir. 1984) ("[A] drug sniffing dog's detection of contraband in luggage 'itself establish[es] probable cause, enough for the arrest, more than enough for the stop.'"); *United States v. Romero*, 156 F.3d 1245 (Table), 1998 WL 537496, at *1 (10th Cir. 1998) ("A drug dog alert alone establishes probable cause to arrest."); *United States v. Pinkard*, 125 F.3d 863 (Table), 1997 WL 634098, at *2 (10th Cir. 1997); *United States v. Klinginsmith,* 25 F.3d 1507, 1510 (10th Cir. 1994) (same).

[177]*Anchondo*, 156 F.3d at 1045.

### 3.     Standing to Suppress the Evidence

"[A]lthough a defendant may lack the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the [defendant's] illegal detention."[178]  Thus, under a two-party inquiry, a passenger may seek suppression of "evidence discovered in a vehicle as the fruit of an unlawful stop, detention, or arrest."[179]  To have evidence suppressed under the fruit of the poisonous tree doctrine, a passenger-defendant must establish that (1) his Fourth Amendment rights were violated, and (2) a factual nexus between the illegality and the challenged evidence.[180]

Under the second prong, defendant must show "but for" causation demonstrating "that the evidence sought to be suppressed is a product of *his* or *her* unlawful detention."[181]  "[A]t a minimum, a defendant must adduce evidence at the suppression hearing showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."[182]  In showing a factual nexus, defendant must put on evidence to demonstrate that, had he "requested permission or otherwise attempted to depart the scene, he would have been able to leave in [the owner's] car."[183]

If defendant is able to make these two showings, then the burden shifts to the

---

[178]*United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001).

[179]*United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996).

[180]*United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).

[181]*United States v. DeLuca*, 269 F.3d 1128, 1134–35 (10th Cir. 2001) (emphasis added).

[182]*United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).

[183]*Id.* at 1131.

government. "[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation."[184]

Based on the analysis above, the stop and subsequent detention were justified. Assuming Elenes-Mombela's stop, detention, or arrest was unlawful, he has not shown a factual nexus between that illegality and the evidence that was discovered. The drug dog search of the vehicle was a valid search-incident to Beltran-Palafox's arrest. Once the dog alerted outside and inside the vehicle, there was probable cause to arrest Elenes-Mombela.

Elenes-Mombela must show that the evidence "would never have been found but for *his*, and only his, unlawful detention."[185] Assuming his detention or arrest was unlawful, he did not request permission or otherwise attempt to leave the scene. Furthermore, he did not have a valid driver's license with which to operate the vehicle if he had sought to leave with it. And, although he asked officers to have his girlfriend pick up the car, the officers did not allow his girlfriend to do so.[186] Thus, any request by Elenes-Mombela to leave with the vehicle likely would have been denied as well. Regardless of Elenes-Mombela's presence on scene at the time of Beltran-Palafox's arrest, the car and its driver would have continued to be detained until the

---

[184]*Torres-Castro*, 470 F.3d at 999 (citing *Nava-Ramirez*, 210 F.3d at 1131); *see United States v. Forbes*, 528 F.3d 1273, 1276 (10th Cir. 2008) (noting that, under the independent source doctrine, the illegal search of the trailer did not produce any evidence or lead to search of the tractor where evidence was found).

[185]*See United States v. DeLuca*, 269 F.3d 1128, 1133 (10th Cir. 2001); *see also United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009) (officer's decision to impound the vehicle and conduct an inventory search was the "but for" cause of the evidence being discovered, not the passenger's arrest).

[186]This was in dispute at the evidentiary hearing. Officer Garcia was unclear whether the officers ever attempted to contact Elenes-Mombela's girlfriend or were unable to reach her. In either case, the Court finds neither Elenes-Mombela nor his girlfriend had a property interest in the vehicle, and there was no evidence that Beltran-Palafox authorized their use of the vehicle.

officers completed the search-incident-to-arrest.  After the drug dog alert, the officers had

probable cause to believe there was evidence of drug crimes in the vehicle and, thus, probable

cause to impound it.  If Elenes-Mombela had walked away from the scene of the search, the

evidence of drugs would have been discovered.  Therefore, Elenes-Mombela has not shown that

the evidence discovered in the vehicle had a factual nexus to *his*, and only his, unlawful

detention or arrest.[187]

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Elenes-Mombela's

Motion to Join (Doc. 41) is granted.

**IT IS FURTHER ORDERED BY THE COURT** that defendants' Elenes-Mombela and

Beltran-Palafox motions to suppress (Docs.  33, 38) are denied.  To the extent the parties have

raised arguments in their briefs relating to the suppression of their statements, the parties have

asked to reserve those arguments until the time of trial.

**IT IS SO ORDERED.**

Dated: June 3, 2010

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[187]*See United States v. Eylicio-Montoya,* 70 F.3d 1158, 1167 (10th Cir. 1995) (finding that suppression was
inappropriate because the search "did not result from the exploitation of information obtained through an illegal
arrest).